## Emory O. Briggs v. Silas Withey and others.

*Excessive damages extorted by fear of criminal prosecution.*    Where a felony can only (as in case of adultery under our statutes) be complained of by the party aggrieved, who has also a civil remedy in damages, it is not lawful to extort excessive damages in a settlement of the civil proceedings, by holding out the ar of criminal proceedings.    And where it is evident the result was reached ,y creating such a fear, the fact that it was done covertly, and indirectly, will not make it more lawful than if the threats had been direct and open.

    The use of legal proceedings for any oppressive purpose will be closely scanned, and relief will be given in equity when such abuse is manifest.

*nconscionable advantage: Counsel.*    Where a party is urged into a settlement by the agency of one whom he is known by all concerned to regard as his own counsel, but who, in fact, favors the other side, and an unconscionable advantage is taken of him, it will amount to a fraud.

*Equity: Relief against securities unlawfully extorted: Fraud.*    Where securities were obtained under these circumstances for five thousand dollars, and the counsel who procured them is shown to have regarded his client's injuries as not likely to authorize a verdict for more than two thousand, the remainder being reckoned as the share of the negotiator for his services, the court, on a bill to foreclose the securities, directed the excess beyond two thousand dollars to be released.

    Equity interferes in such cases of legal extortion, to protect parties not wholly innocent, in the interest of justice, and to prevent the process of the law from being perverted to fraud and oppression.

*Delay.*    The fact that there was a delay of a day or two after the conclusion of negotiations for such settlement, before the securities were actually executed and delivered, where the evidence discloses that the effect of the undue pressure was not in the meantime removed, does not affect the rights of the parties.

*Heard November 2.  Decided November 29.*

Appeal in Chancery from Van Buren Circuit.

BRIGGS v. WITHEY.

This bill was filed by Emory O. Briggs against Silas Withey, Miles F. Beebe, and Thomas H. Stephenson. Withey alone answered, and the bill was taken as confessed by the other defendants. Proofs were taken, and the cause heard upon pleadings and proofs. The decree was for the full amount claimed.

*Dwight May* and *H. F Severens*, for the complainant.

*M. J. Smiley* and *D. Darwin Hughes*, for the defendants.

CAMPBELL, CH. J.

The bill in this case is filed to foreclose a mortgage dated February 27, 1868, to secure five thousand dollars and interest, payable at various periods, running through ten years, according to eighteen promissory notes. The mortgage was made to Joseph W. Huston, and the notes were payable to him or bearer, and stated on their face that they were secured by the mortgage. Complainant holds four notes, amounting to one thousand and fifty dollars and interest, and sues to foreclose to the extent of his ownership, averring the remaining property to be in Beebe and Stephenson.

The defense relied on is, that these securities were obtained of Withey, to settle a charge of adultery with the wife of defendant Beebe, and that they were given under circumstances which rendered them invalid.

Briggs claims to have been a *bona fide* purchaser without notice, but has also introduced testimony to show the validity of the transaction. We think the evidence preponderates against his being a holder without notice, and the case depends upon the general equities.

The settlement was made during a period just after proceedings had been commenced to recover civil damages

24 MICH.—18.

for criminal conversation with Mrs. Beebe, and were begun while Withey was under arrest and preparing to give bail. The mere fact of arrest, apart from other circumstances, is not specially relied upon, as it is not claimed there was any obstruction to obtaining bail. There is no claim that there was not reasonable cause for bringing the action, as there is evidence directly bearing on the alleged adultery. The amount at which bail was fixed is not in evidence. The declaration claimed in the *ad damnum* clause ten thousand dollars.

There is no dispute, therefore, about the power of the parties interested to make a valid compromise of such a claim, and none concerning the propriety of making it at such a time, if fairly and honestly brought about. Everything depends on the real nature of the transaction. One important element in the case which renders it peculiar, is that under our statutes, while adultery is made a felony, it can only be prosecuted at the instance of the injured husband or wife; so that the person aggrieved obtains a control not given by our laws to those suffering from other felonies, and thereby is enabled to wield an influence very different from that of a party who can only claim dominion over civil proceedings.

The statutes cannot be supposed to contemplate that such a power as this can be properly used to secure any larger private damages, or any more favorable settlement than would be obtainable without it. It ought not to enhance a pecuniary recovery or compromise, or to be considered as a legitimate element in concluding any such arrangement.

The law, while it does not disapprove of any fair arrangement, out of court, of claims that may be the subject of litigation, scans with jealousy all transactions wherein legal proceedings are used or threatened for oppressive purposes; and while it will not be over-nice in measuring the conse-

quences which a wrong-doer has incurred, it will not permit the fraudulent use of the means which are designed to secure, as well as may be, the purposes of impartial justice. And as cases where the liability, if existing at all, is easily fixed and ascertained at a sum certain, leave no room for dispute, except as to the one point of liability, there is much less difficulty in determining upon their fairness than where the whole amount is conjectural, even under a clear liability, and where criminal as well as civil consequences are in the minds of the parties, and influence their action. There is no presumption of law against the validity of either; but when the facts are all in proof, the inferences drawn from them will necessarily be such as are reasonably indicated by all the circumstances, as to freedom and fairness.

In the present case, Withey was notified by the officer who served a civil warrant on him in the afternoon, to come over with his bail in the evening and have the bail papers executed. He came over for that purpose with his bondsman, Mr. Mills, and after meeting the sheriff they started out to find some one to draw up the papers. The office of Mr. John R. Baker was lighted up, and they went in and found him in the office. Up to this time there is nothing in the case to indicate that Withey had any idea of doing more than putting in his bail. He had no thought of settling, and no apparent anxiety about it.

Upon informing Mr. Baker what was wanted, he declined drawing the papers unless he should be employed in the suit. Withey said he would rather go to Kalamazoo for counsel, but Baker insisted that he would not draw the papers on other terms. Thereupon Whithey, who did not know Baker, consulted with the sheriff and his surety, and upon being assured by them that Baker was competent and that he had better employ him, Withey did employ him,

and so notified him. This Baker denies absolutely, but the testimony of Mills and Farmer (the sheriff) is clear and decisive, and the subsequent conduct of the parties cannot be explained on any other theory.

Baker at once requested the others to leave the office to enable him and Withey to consult together. The general tenor of Baker's talk with Withey was to urge him to settle on any practicable terms, under the representation that unless he did settle he would be likely to go to state's prison and lose all his property besides. Baker represents his advice as having been volunteered, and not given as counsel. There can be no question that until Baker had given this advice, Withey had never thought of doing any such thing, and that without it there was nothing to lead towards that subject. Huston, the attorney who had brought the suit, was then sent for by Baker, and immediately came over. He appears, from his own testimony, not to have been at his own office, but at the hotel, and the messenger appears to have found him at once. There is much clashing of evidence as to the precise order of events after this, and as to whether the bail bond was signed before or after the talk about settlement; but Mills and Huston both place it after, and such seems more in accordance with the probabilities, though of no great consequence, perhaps. There is also some contradiction as to whether Withey or Baker first spoke to Huston about a settlement. Baker professes to have kept aloof from the negotiation, and to have constantly insisted that he was not acting as counsel. There is not much doubt that he did occasionally make such assertions, but the testimony shows plainly that he was the most active man in the negotiation, while it also shows that he did not in the least aid or advise his client as a counsel should have done, but in effect kept urging the importance of a settlement, with no attempt to inform

him what course to take as to the proper amount. Taken together, the tenor of his advice was that Withey was at the mercy of Huston and Beebe. Huston, with the usual protestations in such cases of his desire to try the case before a jury, and his reluctance to settle, agreed to accept five thousand dollars. The fact that the *ad damnum* was laid at ten thousand dollars, while of no legal consequence whatever, was dwelt on both by Huston and Baker as of considerable importance. Huston testifies that he made no threats, as he probably did not, but it is nevertheless evident that he used suggestions of a kind calculated and intended to produce the same fear that would be excited by threats, and reference to the criminal liability was among those suggestions. He evidently knew that Withey looked on Baker as his counsel, and he could not help seeing that throughout the whole transaction Baker was really seconding his own views. Whatever may be the fact as to any previous understanding between them (the testimony concerning which is not so clearly admissible as to be safely acted on), there is no doubt that the practical effect of their conduct, so far as Withey was concerned, was the same as if there had been concert. Both Baker and Huston testify as if they thought Baker's conduct would have been indefensible if he had been Withey's counsel. There can be no difficulty in seeing that Withey so regarded him, and that this was manifest to every one present. And both the original proposition and the arguments addressed to the fears of Withey, came directly from Baker in the first instance, and were pressed by his urgency, whether he considered himself as a disinterested friend or as a legal adviser of this man, who had been up to this time unknown to him personally,—though he knew beforehand that this suit, of which he then professed ignorance, was to be brought.

The case, then, is one where all that was done on

that occasion was done to bring about a settlement at the expense of a person who, instead of having the aid of counsel, was actually worked upon by one whom he had a right to rely on as his counsel, and where the opposite counsel was advised of the position and made use of it. Two considerations, however, remain; *First*, whether unconscionable advantage was taken, and *second*, whether the subsequent delay has any effect.

In regard to an arrangement like this, where it would be in the power of a jury to fix damages very much according to their discretion, it would be difficult, and probably impossible, to say that any sum intelligently and freely agreed upon would be excessive. But it is not impossible to determine whether, in such a case as this, the plaintiff, or those representing him, did not suppose he was getting excessive damages. As we could not properly interfere with a verdict to reduce it according to mitigating proofs, there would be no special propriety in attempting here to consider their weight if they were fully before us. There are in the case some elements which might have been urged on a jury to reduce damages, but we shall not try to weigh them. We can only judge how the parties acted in relation to the proper amount.

The evidence indicates that unless there was a conspiracy (which we treat as not established), Beebe had given no specific instructions, and had no particular ideas about a settlement. Whether Huston had or had not anticipated a settlement, it is plain that he never seriously considered five thousand dollars as any less than a maximum proposal, and that Baker never seriously tried to reduce it. It is evident, from the facts surrounding the transaction, that there was eagerness on the part of Huston and his associates to bring it to a close; laying aside all the evidence of subsequent individual declarations. And unless we are to

assume that Huston defrauded Beebe—of which there is no appearance or complaint—there is no possible doubt that he thought all that Beebe could properly ask, under the most liberal settlement, could not exceed two thousand dollars. To estimate the value of counsel's services in this brief pursuit at three thousand dollars, and the damages to Beebe, by the seduction of his wife, at only two-thirds as great as this liberal estimate, is ridiculous. No fact could more conclusively show the extent of the advantage obtained by these arrangements. Huston became practically the chief party in interest, and was extorting more for himself than for his client.

But the papers were not executed until the next day but one after the night when these transactions took place. And the question arises, whether the delay and interval did not remove the effect of any undue pressure. If, as a matter of fact, that influence no longer existed in force, then it would be of no account. It appears that Withey went to Kalamazoo, but could not confer with his counsel there, who was to come over to Paw Paw and see him on the 29th,—the mortgage having been actually executed on the 28th, and the settlement first canvassed on the night of the 26th of February, 1868. When Withey came back and met the other parties, he had taken no advice. Withey swears that Baker on this occasion disparaged his other counsel and told him if he did not settle, it would send him to Jackson, and would take all his property. The defendant Stephenson, who was Huston's partner, advised him to settle. Baker denies that there were any threats, and relates to some extent what passed, therein contradicting Withey; but he does not controvert the specific statements as to what he said himself, and states distinctly that he advised Withey not to settle on any terms, if not guilty,—which would not aid a man who was guilty, in determining his course. Baker also denies having any talk

about getting some horses of Withey to apply on the mortgage, but the evidence is clear that he did talk of getting the mortgage at a reduction of one thousand dollars, and that he not only applied to Withey concerning the purchase of horses to apply upon it, but he actually went to Withey's place, just afterwards, to look at them. The circumstances attending the interview when the mortgage was executed, show Withey to have been in the same frame of mind as at the preceding meeting, and his anxiety can only be traced to similar causes.

If equity interfered in these cases, only in favor of parties against whom there was no ground for seeking a settlement, relief would be very rarely granted. These advantages are seldom taken of persons altogether blameless. It interferes to preserve the law, itself, from being disgraced by perversion to extort unconscionable advantages. And the facts before us are very convincing that Withey was led into this settlement under a pressure, coming from sources which deprived him of the means of securing fair treatment, and that there was what is in equity to be regarded as a practical fraud practiced upon him.

The decree must be reversed with costs of this court, and a new decree entered, holding the securities valid only to the amount of two thousand dollars and interest, and only on behalf of the defendant Beebe's share or property in the same; and requiring payment into court within ninety days, of that amount, with costs of the court below, except as reduced by the costs of this court; and in default thereof, that the premises be sold, and the proceeds brought into court, to be so applied on Beebe's share of the securities, and that the cause be remanded, to be proceeded in on these principles.

CHRISTIANCY and COOLEY, JJ., concurred.

GRAVES, J., with some hesitation I concur in the result.