CHRISTIAN W. KRONMEYER *et al.* Plaintiffs in Error, *vs.*
WERDEN BUCK, Defendant in Error.

*Opinion filed April 19, 1913—Rehearing denied June 5, 1913.*

1. DURESS—*when note is procured by duress.* A note executed
by a woman under the belief that her brother would be sent to jail
if she did not immediately do so will be regarded as procured by
duress, even though no promise of immunity was expressly made,
where the circumstances were such as to induce her to believe that
her brother would not be prosecuted if she signed the note but
that he would be sent to jail if she did not.

2. SAME—*when duress is not available to avoid a deed.* Where
a deed is executed to secure an amount of money actually due
from the grantor to the grantee as the result of transactions hav-
ing a criminal aspect, a court of equity will not set aside such con-
veyances even though their execution was procured by threats of
criminal prosecution.

3. SAME—*when a deed will be set aside as obtained by duress.*
A deed to property worth $5000, obtained by threatening to send
the grantor to jail on a charge of embezzlement from his employer,
will be set aside as obtained by fraud and duress where the evi-
dence is doubtful whether the grantor owed his employer anything,
or, at most, more than a mere trifling sum, although the employer
and his attorney charged him with embezzling a large amount of
money and claimed they had proof of that fact, which so wrought
upon the fears of the employee, in his extremely nervous condi-
tion, that he executed the deed.

4. SAME—*what is necessary to sustain a compromise of doubt-
ful claim.* To sustain a compromise of a doubtful claim, where it
later turns out that the promisee does not owe the claim, it is es-
sential that the controversy shall be honestly inaugurated and that
perfect fairness and good faith shall characterize the conduct of
the party seeking to uphold the compromise agreement.

5. SAME—*when rule that deed will not be set aside for failure
of consideration does not apply.* The rule that an executed convey-
ance of real estate will not be set aside for failure of consideration
does not prevent a court of equity from granting relief as between
the parties to a deed, where the deed was obtained by fraud and
duress and conveyed property worth $5000 to settle an alleged
shortage in the grantor's accounts with the grantee, which, if it
existed at all, was for a trifling amount.

WRIT OF ERROR to the Circuit Court of Will county; the Hon. CHARLES B. CAMPBELL, Judge, presiding.

J. W. D'ARCY, for plaintiffs in error.

J. L. O'DONNELL, T. F. DONOVAN, and J. A. BRAY, for defendant in error.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Christian W. Kronmeyer and Sophia M. Staehle, plaintiffs in error, filed their bill in chancery in the circuit court of Will county against Werden Buck to set aside a deed made by Kronmeyer to Buck, and also to compel Buck to refund the proceeds of a $1500 note given to the Will County National Bank, which said note was signed by both complainants. The prayer for relief was based on the charge that the instruments were fraudulently obtained through threats, coercion and duress and that they were without consideration. Defendant in error answered denying the allegations of the bill, to which a replication was filed, and the cause was heard upon evidence given in open court. The court below dismissed the bill for want of equity, and complainants have sued out a writ of error.

The evidence shows the following state of facts: Defendant in error, Buck, was engaged in the sale of building material, such as lime, cement, tile, sewer pipe, and also sold coal. Kronmeyer had been in the employ of Buck as salesman and general foreman in connection with his business for about ten years. His duties required him to be in and about the office and yards of the place of business. He was authorized to, and did, receive cash for merchandise sold, usually in small quantities, and carried a leather pouch in which the money was placed as it was taken in by him. The books were kept in the office, and when money was received or paid out by Kronmeyer it was his duty to make

an entry on the cash book in the office showing the transaction. These transactions were not always entered separately, but one entry would often cover several small transactions and would be entered as cash sales. Sacks were frequently returned and cash paid for them at the rate of ten cents each, and when Kronmeyer paid out cash for sacks or for other purposes it was his duty to make an entry on the book charging cash with the amount paid out. He owned a house in Lockport in which he resided with his wife and two children until January 5, 1911, when his wife died after a protracted illness. After the death of his wife the two children, being aged twelve and ten years, respectively, were sent to Chippewa Falls, Wisconsin, where he had a married daughter residing. He continued to reside in Lockport, occupying one of the rooms of his house with his furniture. After the death of his wife his health commenced declining. He lost between eighty and ninety pounds in weight during the two months following his wife's death. He became very nervous and was unable to sleep. He was under the treatment of physicians but was constantly growing worse. On March 18, 1911, he went to Chippewa Falls to visit his children. The evidence is uncontradicted that he was in a highly nervous condition, unable to sleep, and had an excited, unusual stare in his eyes. On March 22 he returned to Joliet and resumed his duties at Buck's place of business. There had never been difficulty of any character between Kronmeyer and Buck, and the former had no intimation that he did not enjoy the complete confidence and esteem of Buck. Coll McNaughton was the attorney and confidential adviser of Buck. His office was about six blocks from Buck's place of business. On the morning of March 23 Kronmeyer received a telephone call from McNaughton requesting him to come to McNaughton's office. He reported to his employer that he was wanted at McNaughton's office, and Buck directed him

to take his horse and go and see McNaughton. On his arrival at the office the door was closed and a conversation took place, followed by the execution of the deed which is sought to be set aside in this proceeding. There is a disagreement between Kronmeyer on the one hand and McNaughton and Buck on the other as to what took place in the office. Kronmeyer testifies that when he arrived at the office McNaughton spoke to him in a harsh tone of voice and accused him of stealing from Buck, and, pointing toward the county jail, which stood nearby, said that he would be sent to jail unless the matter was adjusted. He also testifies that police officer Hennessey was outside the door; that within two or three minutes after Kronmeyer arrived at the office Buck entered and told Kronmeyer he had been robbing him for years, and accused him of having stolen $10,000 from him. Kronmeyer testifies that he denied having taken any money from his employer whatever; that he was excited and so frightened at the harsh methods of his accusers and the character of the accusation that he did not know what he was doing; that McNaughton and Buck demanded that he fix the matter up, and he told them he had no money with which to fix anything; that the conversation then turned to his property, and he told them of his Lockport residence and said it was worth $5000, subject to a $1500 mortgage; that McNaughton went out and was gone about thirty minutes to look up the title of the Lockport property, and when he returned he said that the title was all right and that Kronmeyer had told the truth about the encumbrance but said he had over-estimated its value,—that it was not worth exceeding $3800. A deed was then prepared under the direction of McNaughton, conveying the property, together with a vacant lot in Lockport estimated to be worth from $800 to $1200, to Buck. After the deed had been signed and acknowledged Kronmeyer was asked what he was going to do about the $1500

mortgage on the property. He again said he had no money, and he was asked if he had any friends who would sign a note with him, to which he replied that he did not know; that he would see Mrs. Hill, a relative. A note for $1500 was then filled out by McNaughton and he and Kronmeyer drove away in a buggy to see Mrs. Hill, but Mrs. Hill declined to sign the note. They then drove to Mrs. Staehle's place, who is a sister of Kronmeyer. The evidence is not seriously in conflict as to what took place at Mrs. Staehle's. Kronmeyer took the note and went to the store where Mrs. Staehle was found and walked up to her and said, "Sign this note; Buck accuses me of stealing from him, and if I don't get this note signed I will have to go to jail." He was very much excited and Mrs. Staehle thereupon signed the note. McNaughton remained in front of the place, in the buggy. After the note was brought back with Mrs. Staehle's name to it, McNaughton took the note and called Mrs. Staehle and asked her if that was her signature, and she said it was. The two men then drove to the Will County National Bank, where the note was presented for discount. The bank objected to the note because it was not written on one of its forms. A new note was thereupon filled out at the bank for $1500 on the usual bank form and McNaughton and Kronmeyer again returned to Mrs. Staehle's place and she signed this note and the former one was destroyed. McNaughton and Kronmeyer again visited the Will County National Bank, where the note was cashed. The proceeds, being $1477, were taken back to McNaughton's office and there turned over to Buck, who executed some sort of a writing purporting to be an assumption of the encumbrance upon the Lockport property. McNaughton and Buck give a somewhat different version of the conversation that took place in the office. McNaughton testifies that when he first accused Kronmeyer of embezzling his employer's funds he denied it, and he and

Buck both testify that when Buck came in and accused him of robbing Buck of $10,000 Kronmeyer said, "Why, Werden, it isn't that much." Both McNaughton and Buck testify that the subject of fixing up the alleged shortage was first introduced by Kronmeyer; that he said, "I don't want any trouble about this and I want to fix it up," and offered to convey the property in question, and they both deny that there were any threats or harsh methods resorted to to secure the execution of the deed. McNaughton does not remember the presence of policeman Hennessey, and says that if he was present it was not by his procurement.

The above is a general outline of the facts relating to the execution of the deed and note. There are other facts and circumstances, both antecedent and subsequent, which are material. The most important of these will here be referred to.

There were other employees connected with Buck's place of business. Five or six people were employed there. Mrs. Buck, wife of defendant in error, kept the books in the office. One or two were drivers. We infer that their business was to haul merchandise, such as was kept for sale, to and from Buck's place of business. Buck spent a portion of his time at this place of business, but he had other interests that required attention so that he was not constantly at this place. In his absence Kronmeyer seems to have been his managing representative. E. W. Hall's business was to assist in loading and unloading goods and do any general work around the yard or in the office building. Frequently persons would make small purchases of lime, cement, coal or lumber and pay the cash for the purchase at the time the goods were bought. These sales were made both by Hall and Kronmeyer, but Kronmeyer had charge of the cash, and when Hall made a sale he testifies that he would report the same to Kronmeyer and turn over the money to him. On March 8, 1911, Hall reported to

Buck that Kronmeyer was receiving money which he was not accounting for. He told Buck, in substance, that Kronmeyer was not dealing honestly with him and had not been for several years. Buck told Hall to keep a watch over Kronmeyer and make a note of each item of cash that was received by Kronmeyer and not reported by him. At that time Hall was receiving $12 a week salary. After Kronmeyer's discharge he was promoted and his salary increased to $15 a week. After being requested to watch Kronmeyer, Hall made a memorandum covering various transactions from March 8 to March 17, inclusive. This memorandum shows: "March 8, coal, cement, $1.25; March 9, coal, $1." This is followed by other like entries: March 8, four entries; March 9, three entries; March 10, three entries; March 13, one entry; March 14, two entries; March 16, one entry; March 17, four entries. The largest single item on the memorandum is March 10, coal $2. The total amount for the eight days covered by the memorandum is $17. Of this amount $7.90 is for sacks returned. The evidence of Hall is not at all conclusive that the cash items mentioned in his memorandum were misappropriated by Kronmeyer. His evidence is especially unsatisfactory in its application to the items for sacks returned. The inference from his statements on this subject is that Kronmeyer would charge cash with sacks returned when, in fact, no sacks were returned, and that these items would balance that amount of cash retained by Kronmeyer. In regard to whether sacks were returned on the several dates on which these items are entered, Hall simply testifies that no sacks were returned on those dates "to his knowledge." He says that he thinks if any sacks had been returned he would have known of it; that he did not know of any being returned on those dates, but frankly admits that sacks might have been returned without his knowledge; that he was not at the place of business all the time and when he was away he had asked the "boys" to notice

whether any sacks were returned, and his testimony is based, at least in part, upon the hearsay statements of other employees. His evidence may fairly be said to raise a suspicion but it falls far short of proving the fact. In regard to the other items, which consist of petty sales running from ten cents to two dollars, his testimony is open to several sources of possible mistake which are not inconsistent with an honest purpose on the part of the witness to tell the truth. The pages of the cash book covering the dates on which the alleged shortage is supposed to have occurred were submitted in evidence. In some instances there are entries on the cash book of items of cash received which are entered as "coal and lime" and other articles, without giving the name of the person to whom such sale was made, and corresponding items are found in Hall's memorandum, but neither in the memorandum nor on the day book are the entries full enough to enable one to certainly tell whether they are intended to represent the same transaction. A careful comparison of the memorandum with the items on the cash book for the several days covered by the memorandum shows that there are entries on the cash book which may cover substantially every item in the memorandum, but the entries, both in the memorandum and the cash book, are so meager and enigmatical as to make it impossible to arrive at reasonable certainty as to the identity of the transactions represented in the different entries. Again, on the cash book it appears that in some instances a gross sum was entered as cash received, with no information as to the source from which it came or the items represented in the total. It is not at all impossible that the items for small cash sales which Hall claims were not reported may have been aggregated and reported in a total sum, and the testimony of Kronmeyer as to his method of reporting sales tends strongly to support this view.

A careful examination of the direct evidence tending to show that Kronmeyer was guilty of embezzling his em-

258 — 38

ployer's money convinces us that the most that can be said of it is that it raises a suspicion that a trifling amount of money received was not accounted for, but this evidence does not convince us, however, that this trifling discrepancy may not have been due to careless methods of doing business rather than to an intention on his part to misappropriate the funds. Passing from the direct testimony on this subject, there is nothing in the surrounding circumstances that supports the theory that Kronmeyer was guilty of embezzling a considerable sum of money. Kronmeyer was about fifty years of age. He was an industrious and efficient employee. He had held a position with defendant in error for ten years. He had an income of $75 salary and $50 rentals. It is not shown that he was a speculator, a gambler, or that he had any other extravagant habits. It is not shown that he had made any investments that were beyond his apparent income. In a word, there is nothing whatever in the life, character or conduct of Kronmeyer to indicate that he was living beyond his legitimate income. If he embezzled a large sum of money from his employer, the question as to what he did with it is not answered by any proof in this record. Buck, in his testimony, makes the statement that his business did not seem to be as profitable as he thought it ought to be; that he had more difficulty in getting money enough to pay his bills than he should, considering the amount of business he was doing and the success he was having in making collections. This general feeling which he had in regard to the profits of his business was not based on any positive knowledge. It is not shown that an inventory had been taken at any time of the stock for the purpose of ascertaining a basis upon which to determine whether there was a leak anywhere through which his assets were disappearing. His business methods were extremely loose, and the dangers from this source were increased by want of attention and personal supervision on his part. Under such circumstances, the fact that

the cash drawer did not always respond as liberally to his demands as he expected can hardly be accepted as evidence that someone had robbed him of $10,000.

We have now stated all of the facts shown by the proofs which appear to have any pertinency to the legal aspects of this controversy. All of the facts tending to show Kronmeyer's embezzlement that were known to Buck and his attorney at the time the conveyance in question was procured have been stated, and the record fails to show that any additional facts have come to light since the execution of the deed. It will thus be seen that at the time Buck procured the deed to all the real estate that Kronmeyer owned, and $1477 in cash, there was not, nor is there now, clear and satisfactory evidence that Kronmeyer actually owed him one cent. Having obtained this property, defendant in error insists on his right to retain it regardless of whether Kronmeyer owed him anything or not. He frankly admits on the witness stand that he would insist on retaining all of this property even if he knew Kronmeyer only owed him $5 at the time the deed and money were obtained. What are the legal rights of the parties under the foregoing facts?

We have no hesitation whatever in holding that the execution of the note by Mrs. Staehle was procured by duress. She was an innocent third party. There can be no pretense that she was indebted to Buck in any amount. The first intimation that she had of any trouble was when her brother approached her in a highly excited manner and told her Buck claimed he had been stealing from him and that unless he got this note executed he would have to go to jail. She signed the note to keep her brother from going to jail and under the belief that if she did sign it he would be saved from imprisonment and prosecution. It is but natural that she would cling to her brother and seek to aid him in his trouble under the pressure of his importunities, which

were not rendered the less forceful and overpowering by the presence of McNaughton. Mrs. Staehle testifies that the only reason she excuted the note was to save her brother from the impending prosecution. While no promise of immunity was expressly made, yet it is perfectly clear that both she and Kronmeyer were influenced by the understanding, which was clearly to be implied, that if the matter was adjusted satisfactorily Kronmeyer would not have to go to jail or be prosecuted. *Miller* v. *Miner Lumber Co.* 98 Mich. 160; 57 N. E. Rep. 101.

The execution of the note and deed by Kronmeyer stands upon a different footing. Duress is not available as a defense against a note or other instrument executed by one who is, in fact, guilty of misappropriating the money of another, although the execution of the instrument is obtained by threatened prosecution, if the instrument is executed in payment of a debt honestly due. In such case the law regards the existence of a debt, and not the threatened prosecution, as the consideration. The authorities support the proposition that where a deed or mortgage is executed to secure an amount of money actually due as the result of transactions having a criminal aspect, equity will not set aside such conveyances even though their execution was procured by threats of criminal prosecution. (*Briggs* v. *Withey,* 24 Mich. 136; *Rood* v. *Winslow,* Walk. Ch. 342; *Betts* v. *Village of Reading,* 93 Mich. 79; 52 N. W. Rep. 940; *Beath* v. *Chapoton,* 115 id. 506; 73 id. 806. In *Bodine* v. *Morgan,* 37 N. J. Eq. 426, a father and son were charged with fraudulently taking and appropriating business orders. The father settled and gave a mortgage of $5000. The court said: "But further, the threat to arrest him for the unlawful appropriation of their goods and orders to his use unless he should indemnify them, constituted, if it was made, no duress, and if the mortgage had been given under the pressure of such a threat it would

not have affected its validity." But in all these cases where conveyances have been upheld which were executed by a defaulter or embezzler in settlement of his shortage there was no question about the existence of the debt to pay or secure which the conveyance was executed. The case at bar does not fall within the rule of the foregoing authorities, for the reason, as we have already sought to show, the evidence of the existence of the debt is extremely doubtful, and there is no evidence that tends to prove the existence of a debt of more than $17. The evidence in this record shows that McNaughton accused Kronmeyer of embezzlement. Kronmeyer denied the charge. McNaughton told him that he did not expect him to confess his guilt but that he had the proof of his guilt, and exhibited to him certain memoranda, giving dates and amounts, by which he said he was able to prove he had stolen. If Kronmeyer was, in fact, innocent, and, when confronted with a charge of this kind by a lawyer whom he had always regarded as a friend, executed the instruments in question to avoid a prosecution for a crime which he had not committed, then there was both fraud and duress and a total failure of consideration. Upon this hypothesis of fact the case would fall under the rule of *Knotts* v. *Preble,* 50 Ill. 226. In that case Preble had an insurance on a stock of goods in a store room in Lexington which was totally destroyed by fire. The fire was communicated from the Preble building to one occupied by Knotts & Steers, which was consumed, with a loss of several thousand dollars to Knotts & Steers. After the fire Knotts persuaded Preble that he was under obligations to bear a part of their loss; stated that the fire originated from a defective flue in the defendant's building, and said that "he could prove things about the fire that Preble little thought of." Under the belief that the plaintiffs had some sort of claim on him, and under the influence of representations made by Knotts, Preble executed a note payable to Knotts & Steers. This court, in sustaining a judgment

for the defendant on the ground that there was no consideration, on page 227 said: "It is no doubt true that a promise made to settle a doubtful right or to get rid of a probable liability is binding and made upon a good and valuable consideration, and it is no defense for the promisor to say he was mistaken in regard to his liability. But this is not such a case. The note was obtained solely by force of these false representations made by Knotts that he could prove Preble was the cause of the fire. Knotts failed to prove any such thing. The facts in connection with the case were fairly left to the jury, and they have said there was no ground whatever on which to base the plaintiffs' claim. This destroys the idea of good faith on plaintiffs' part in making the claim."

We are not unmindful of the rule of law announced in the line of cases of which *McKinley* v. *Watkins,* 13 Ill. 140, *Honeyman* v. *Jarvis,* 79 id. 318, and *Pool* v. *Docker,* 92 id. 501, are illustrations, to the effect that a compromise of a doubtful right is a sufficient consideration to support a promise even though it may afterwards turn out that the right is on the other side, where there is neither actual nor constructive fraud, and the parties, acting in good faith for the purpose of settling a matter in dispute, come to a final agreement. The case at bar does not fall within that rule. In order to bring the case within the rule of these and other like cases it is indispensable that the controversy should be honestly inaugurated and that perfect fairness and good faith should characterize the conduct of the party seeking to uphold the compromise agreement. It requires only a brief reference to the evidence in this case to show that it cannot be upheld as a compromise of a matter honestly in dispute between two parties.

But it is said by the defendant in error that the deed, being an executed conveyance of real estate, cannot be annulled or set aside by evidence that there has been a fail-

ure of consideration, and *Redmond* v. *Cass,* 226 Ill. 120, *Poe* v. *Ulrey,* 233 id. 56, and other cases are relied on in support of this proposition. We recognize the full force of the well established rule that a failure of consideration for an executed conveyance of real estate gives the grantor no right, at law, to avoid his conveyance. (Page on Contracts, sec. 1479, and cases there cited.) But this is an equitable proceeding, in which specific justice between the parties before the court is of greater importance than the mere mechanical enforcement of a general rule of law. Courts of equity, in order to relieve against a great hardship where one has been induced to convey real estate for little or no consideration, will seize upon circumstances of oppression, fraud or duress for the purpose of administering justice in the case in hand. *Kusch* v. *Kusch,* 143 Ill. 353, *Dorsey* v. *Wolcott,* 173 id. 539, and *McClelland* v. *McClelland,* 176 id. 83, are illustrations of different aspects of the rule above stated. Assuming that Kronmeyer did not owe Buck anything, or only the nominal sum that the evidence in this record tends to prove, it would be a reproach to the law to say that Buck could take title to $5000 worth of property and hold it because his title was evidenced by a deed under seal, which cannot be impeached by showing a failure of consideration. The facts already adverted to are sufficient to give a court of equity jurisdiction to rescind this transaction. If Kronmeyer embezzled any money belonging to Buck he ought to re-pay it, but in the absence of convincing evidence that he owes any sum whatever, and with only proof enough to raise a bare probability that he may owe a trifling amount, a court of equity will not permit Buck to take the law in his own hands and penalize Kronmeyer by taking and retaining title to this property. The deed should be set aside. If Buck has received any rents or net profits from the real estate he should be required to account for the same. If the encumbrance

on the property has been discharged by Buck, Kronmeyer will receive the property clear, and in such case will not be entitled to a decree for any amount that Buck may have paid on said encumbrance. If the encumbrance is still unpaid Buck should be required to account for $1477, and interest thereon at the rate of five per cent from the day he received it.

The decree of the circuit court of Will county is reversed and the cause remanded to that court, with directions to enter a decree for plaintiffs in error in accordance with the views herein expressed.

*Reversed and remanded, with directions.*