(No. 19592.—

ABBIE H. TRAMBLAY, Appellant, *vs.* THE HYDE PARK
STATE BANK, Appellee.

*Opinion filed June 19, 1929—Rehearing denied October 9, 1929.*

HENRY O. NICKEL, (JOHN P. SULLIVAN, of counsel,)
for appellant.

WILLIAM J. PRINGLE, and EDWIN TERWILLIGER, for
appellee.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the
court:

Appellant filed a bill in the superior court of Cook
county on February 14, 1928, to set aside a deed made by
her and her husband to appellee March 22, 1924. The bill

alleges as grounds for asking that the deed be set aside, that appellant was confined to her bed with illness, had a high temperature, was extremely nervous and in a precarious state of health, and that she was forced involuntarily to execute the deed to prevent the prosecution of her husband for crime and his being sent to the penitentiary; that she did not know the paper she signed was a deed at the time she signed it. Appellee filed an answer denying the allegations of the bill, and also filed a cross-bill to set aside a recorded affidavit of ownership filed by appellant after the date of the deed, and to cause the premises to be vacated and surrendered to appellee. After the pleadings were settled a hearing was had thereon, and the court found the equities of the case were in favor of the cross-complainant and dismissed the bill of appellant for want of equity. A decree was entered substantially in accordance with the prayer of appellee's cross-bill. From that decree this appeal has been prosecuted by appellant.

The principal facts out of which this case arose are, that appellant's husband, Oliver Tramblay, had been for four or five years cashier of the appellee bank. Prior to March 22, 1924, he had through brokers engaged in speculation on the board of trade, using the bank's funds, and had lost more than $60,000 of the bank's money. Something occurred at the bank the morning of March 22, 1924, which caused Tramblay to suspect he was caught. He left the bank, went to his home and informed his wife of his predicament and that he had embezzled the bank's money. Mrs. Tramblay was ill in bed at the time with "flu" and tonsilitis and had a temperature of 103 degrees. It was, of course, a shock to her, as she had never, so far as the evidence shows, had any knowledge or suspicion that there was any difficulty or dishonest conduct on the part of her husband at the bank. After Tramblay had told his wife about the matter he called up John A. Carroll, the president of the bank, and asked him to come out to Tramblay's residence. Carroll did so,

accompanied by John J. O'Connell, secretary of the bank, and E. J. McMullen. The latter testified he was then employed by the bank as floor man or special officer. The three had a talk with Tramblay in the dining room of the Tramblay home. Mrs. Tramblay was in bed in her room, and they could hear her groaning and moaning. Tramblay indicated every evidence of being greatly distressed and disturbed. He told the president of the bank that his speculations amounted to more than $60,000, and in the course of the talk spoke of committing suicide. Carroll testified that he asked Tramblay if he would do what he could toward making restitution. Tramblay said he had nothing except their home; that he had lost everything, but that he would do all he could. Carroll told him he would want him to assist the bank in getting the money from the people he speculated with, as they had no right to speculate with a bank officer. He asked him if he was willing to transfer their home, and Tramblay said he would do everything he could to make restitution. Carroll told him they could stay in the house until they found a place, and there would be no hurried action taken and the bank would not be harsh with them. Carroll went to the door of Mrs. Tramblay's bed-room and talked with her. They discussed the transfer of the house, and he told her the bank would not be in a hurry to get possession; that she could take her own time; that he did not know what the outcome of the case would be, except that he expected the Tramblays to make such recovery as they could for the bank, and they both readily consented to do it. He told her he would have a deed prepared and have it sent out for her signature, and both said that would be all right. He took O'Connell back to the bank with him but left McMullen with Tramblay, as the latter was in a nervous condition and had spoken of suicide. The deed was prepared at the bank and taken to the Tramblay residence by O'Connell in the early afternoon of the same day. It was signed and acknowledged before O'Connell as

a notary public and was recorded in the recorder's office on March 25, 1924. Carroll also testified that before he left Tramblay's house in the morning he asked both of them if they were willing to sign the deed to the home property, and both said yes. It was about eleven o'clock when Carroll was at Tramblay's house. He did not know then that the title to the property was in Mrs. Tramblay, but he afterwards learned it was. Mrs. Tramblay was in bed, groaning, when he was there. She was prostrated by the news of her husband's confession. Tramblay called Carroll out there to make whatever restitution was in his power, and both Tramblay and his wife agreed to do what they could in that line. Mrs. Tramblay was crying. He talked to her from the doorway into her bed-room. O'Connell was standing by Carroll when he talked with Mrs. Tramblay and corroborated Carroll's testimony.

O'Connell testified Carroll asked the Tramblays if they would sign the deed to the property, and Mrs. Tramblay said they would; that they would do anything in their power, and it was understood the deed was to be prepared and brought to them by O'Connell. When O'Connell arrived with the deed Tramblay told his wife that O'Connell was there with the deed to the property and asked if she would sign it. She said yes. O'Connell asked Tramblay to procure pen and ink. Tramblay took the deed to his wife's room and was followed to the bed-room door by O'Connell and Williamson, the latter of whom was assistant general manager of the insurance company that had previously issued a fidelity bond for Tramblay and who had accompanied O'Connell to Tramblay's house. O'Connell asked Tramblay to get a book for his wife to place the paper on, as she was lying in bed. Tramblay procured a book and O'Connell took the deed to Mrs. Tramblay. He told her it was a deed to the property, and she said, "All right," and signed it. O'Connell also testified he read the words in the acknowledgment of the deed and asked Mrs.

Tramblay if it was her free will. She replied it was. He then took the instrument to the dining room table, signed the acknowledgment as a notary and left the house. When asked in the morning by Carroll to go to the Tramblay residence O'Connell said he did not know what they were going for; that Carroll said Tramblay had telephoned asking him to come out and see him on important business. When they arrived Tramblay took them into the dining room and made a confession of his embezzlement. After the confession they went to the bed-room door of Mrs. Tramblay's room and they talked about giving a deed to the property. She said she would sign it. The deed was signed by Mrs. Tramblay about 1:30 o'clock. On their first visit to the Tramblay residence they were not there over half an hour, and when O'Connell returned with the deed in the afternoon he was not there more than fifteen or twenty minutes. Neither appellant nor any of her witnesses testified that there was any promise made of immunity from prosecution for her husband if she signed the deed. That subject was not mentioned.

Appellant relies upon cases cited, in most of which the person accused of stealing or embezzling money was either not guilty or his guilt was doubtful, and cases where the parties losing the money by the criminal act of the person accused agreed that if it was restored there would be no prosecution for the crime. One of the cases cited is *Williams* v. *Bayley,* 1 L. R. (Eng. & Ir. App.) 200, decided by the House of Lords. The case was first decided by Vice-Chancellor Stuart. (4 Giffard, 638.) It was then appealed to the House of Lords. The case involved the validity of notes signed by James Bayley, the father of William Bayley, to take the place of notes given by William to the bank which employed him and upon which he had forged his father's name. Three opinions were delivered by the House of Lords, one by the Lord Chancellor, one by Lord Chelmsford and one by Lord Westbury. It is not entirely

clear as to just what occurred between the bank and James Bayley at the time the notes were given. The son had confessed the forgery, and, of course, was subject to prosecution and imprisonment or deportation. Whether any promise of immunity was made by the bank if the notes were given is not clear, but in all the opinions it is treated as if that was understood between the parties. The case appears to have been treated by the Lords as one where it was expressly or impliedly understood that there would be no prosecution of the son if the father gave the security. The decision was in favor of the father.

Another case much relied upon by appellant is *Rostad* v. *Thorsen,* (Ore.) L. R. A. 1917-D, p. 1170. In that case Rostad was cashier of a bank and by forgeries and embezzlement had caused the bank to become insolvent. The president and other officials of the bank were previously good friends of Rostad and had confidence in his integrity. When Rostad was accused by them of the shortage he did not deny it but expressed his willingness to make restitution. He said he had little property but that his wife would inherit a considerable amount of property soon, and that would make notes signed by her good. The wife owned the home, and Rostad requested the president of the bank to call at their home to assist him in inducing his wife to sign a deed. The president of the bank called as requested. The wife executed the deed and in addition signed three notes aggregating $15,270. Afterwards the wife brought suit to cancel the deed and notes. The case was decided in her favor by the lower court and appealed to the Supreme Court. That court said, in part, in its opinion: "We think it is established by the preponderance of the evidence that the defendants at least impliedly gave Rostad to understand that if he made restitution he would not be prosecuted, and that there was an implied threat that unless he did make restitution the law would be permitted to take its course. The matter was in such a position that

it was evident his only chance of escaping the penitentiary was to make restitution for the amount of his theft. The evidence also indicates that Rostad, previous to the visit of Hendricksen to the plaintiff, informed her of the circumstances and gave her to understand that unless she assisted him he would be sent to the penitentiary. We think the evidence also establishes the fact that when Hendricksen visited her, while he did not in terms threaten that Rostad would be prosecuted unless he made restitution, he used language which conveyed that impression, and that he certainly went so far as to give her to understand, so far as the bank or its officers were concerned, no prosecution would be instituted in case she joined with Rostad in executing such papers as would make her jointly liable for the amount embezzled by him. In fact, Mr. Hendricksen admits having gone this far. We are satisfied from the testimony that Mrs. Rostad was induced to sign the papers in question solely to prevent her husband from being prosecuted and that the defendants understood this, and that she understood that his prosecution would certainly ensue unless the defalcation was made good through her assistance, and that this and no other consideration was the cause of her signing the notes in question. While no actual threat to put her husband in the penitentiary was made in words, the situation was placed before her in such a light as to make it suggest to her that the only way she could save him from imprisonment and disgrace was by executing the notes. There was no other consideration for them." The Hendricksen mentioned in the court's opinion was president of the bank. The court said that Mrs. Rostad signed the papers under the promise of defendants to do everything in their power to stifle the prosecution. A rehearing was granted in the case, and subsequently a short opinion was filed modifying and affirming the original opinion. In that case the court found that the evidence showed the president of the bank gave the wife of Rostad to understand that un-

less she did what she was requested to, her husband would be sent to the penitentiary. The court said the president of the bank admitted having gone this far.

Another case much relied on by appellant is *Kronmeyer* v. *Buck,* 258 Ill. 586. In that case Kronmeyer was employed by Buck as a salesman and general foreman in Buck's business of selling building materials, sewer pipe and coal. He was authorized to, and did, receive cash for merchandise sold, usually in small quantities, and his duty was to make an entry in the cash book in the office showing the transaction. Kronmeyer resided with his wife and two children until January 5, 1911, when his wife died. After her death the two children were taken to the home of his married daughter, in Wisconsin. Kronmeyer's health failed after the death of his wife. He lost materially in weight, became very nervous and was unable to sleep. He was under the treatment of a physician, but grew worse, and on March 18, 1911, he went to Wisconsin to visit his children. On March 22, 1911, he returned to Joliet and resumed his duties at Buck's place of business. He was not aware that he did not have the esteem and confidence of Buck, and the next day after his return he was called by the attorney for Buck and requested to come to the attorney's office. When he arrived there he testified the attorney spoke in a harsh tone of voice accusing him of stealing from Buck, and, pointing to the county jail, which was near by, said he would be sent to jail unless the matter was adjusted. Buck also came to the office of the attorney while Kronmeyer was there and told Kronmeyer he had been robbing him for years and accused him of having stolen $10,000 from him. Kronmeyer denied having taken any money from his employer. He was excited and frightened at the charges and threats of his accusers. Buck and his attorney demanded the matter be fixed up. He told them that he had a residence in Lockport worth $5000, subject to a $1500 mortgage. The attorney went out for half an

hour to look up the title to the property, and when he returned said the title was all right but that the property was not worth to exceed $3800. The attorney prepared a deed conveying the property, together with a vacant lot in Lockport worth from $800 to $1200, to Buck. He was then asked to secure the payment of the $1500 mortgage, and was asked if he had any friends who would sign a note with him. He suggested he would see Mrs. Hill, a relative. A note for $1500 was made out by Buck's attorney and he and Kronmeyer drove in a buggy to see Mrs. Hill, but she declined to sign the note. They then drove to Mrs. Staehle's, a sister of Kronmeyer. Kronmeyer took the note and went to the store where his sister was employed. He asked her to sign the note and told her Buck accused him of stealing, and if he did not get the note signed he would have to go to jail. He was much excited and Mrs. Staehle signed the note. The attorney remained in front of the place where Mrs. Staehle was until the note was brought back with her signature to it, and he and Kronmeyer drove to the Will County National Bank, where the note was presented for discount. The bank objected to it because it was not on one of its forms. A new note was drawn for $1500 on the bank's form, and the attorney and Kronmeyer returned to Mrs. Staehle's place and she signed the new note and the former note was destroyed. Buck's attorney and Kronmeyer took the new note to the bank, where it was cashed for $1477. Buck and his attorney denied using harsh methods to secure the deed. The court said the evidence was unsatisfactory that Kronmeyer had stolen his employer's money, and the most that could be said of it was that it raises a suspicion that a trifling amount of money he received was not accounted for. It was not shown that he made any investments beyond his apparent income. The court said Mrs. Staehle was not indebted to Buck in any amount whatever. "The first intimation that she had of any trouble was when her brother approached

her in a highly excited manner and told her Buck claimed he had been stealing from him and that unless he got this note executed he would have to go to jail. She signed the note to keep her brother from going to jail and under the belief that if she did sign it he would be saved from imprisonment and prosecution. * * * While no promise of immunity was expressly made, yet it is perfectly clear that both she and Kronmeyer were influenced by the understanding, which was clearly to be implied, that if the matter was adjusted satisfactorily Kronmeyer would not have to go to jail or be prosecuted. * * * Assuming that Kronmeyer did not owe Buck anything, or only the nominal sum that the evidence in this record tends to prove, it would be a reproach to the law to say that Buck could take title to $5000 worth of property and hold it because his title was evidenced by a deed under seal, which cannot be impeached by showing a failure of consideration. The facts already adverted to are sufficient to give a court of equity jurisdiction to rescind this transaction. If Kronmeyer embezzled any money belonging to Buck he ought to re-pay it, but in the absence of convincing evidence that he owes any sum whatever, and with only proof enough to raise a bare probability that he may owe a trifling amount, a court of equity will not permit Buck to take the law in his own hands and penalize Kronmeyer by taking and retaining title to this property. The deed should be set aside." The court reversed the decree dismissing the bill and remanded the case, with directions.

*Herbst* v. *Mauss,* 7 Ohio Dec. (Reprint,) 701, was first decided in the superior court of Cincinnati and was appealed to the district court, where it was affirmed. The appeal case is reported in 7 Ohio Dec. (Reprint,) 215. The decision was by Judge Harman in the superior court. After discussing the *Bayley case, supra,* Judge Harman said: "An unlawful agreement is not to be presumed. It must be proved—not necessarily a contract in express terms,

but the circumstances must fairly satisfy the court that such was the mutual intent and understanding. It is certainly not an agreement to stifle criminal prosecution for one party to make restitution, actuated partly or entirely by the hope that the other party will refrain from prosecution, nor for the other party to accept restitution intending upon receiving it not to prosecute. Probably no guilty person ever so acted without such hope, and no injured person, unless especially severe, ever received amends without more or less willingness to show mercy. But there are no elements of an agreement in such cases. There is no meeting of minds. What is agreed upon is a perfectly lawful transaction—the payment, without suit, of what a court of equity without reference to criminal prosecution would order to be paid. Failure to prosecute must be one of the things upon which the transaction is mutually based. In this case there is no evidence whatever of any request or promise, much less agreement, to forbear prosecution." That so well expresses our view that we take the liberty of incorporating it as a part of our opinion.

It is not unlawful for the owner of property which has been stolen or embezzled to receive from the criminal payment or part payment for the money or property taken, but if the owner of the property makes an agreement not to prosecute the criminal if restitution is made that makes the agreement unlawful, and a paper executed, whether a deed or note, under such agreement is not enforcible. *Lomax* v. *Colorado Nat. Bank,* 46 Colo. 229, 104 Pac. 85; *Roth* v. *Holmes,* 52 S. W. (Tenn.) 699; *National Bank of Savannah* v. *All,* 260 Fed. 370; *Lefebre* v. *Dutruit,* 51 Wis. 326.

There is no doubt that appellant was greatly distressed over the information of her husband's crime, but that she knew what she was doing when she signed the deed seems clear from the proof and that no promise or intimation was made that if she signed it her husband would not be prose-

cuted by the bank. We conclude that appellant did not prove her bill. It may be, and probably was, true that appellant and her husband thought if they made partial restitution there would be no prosecution. As said by Judge Harman: "Probably no guilty person ever so acted without such hope, and no injured person, unless especially severe, ever received amends without more or less willingness to show mercy. But there are no elements of an agreement in such cases. There is no meeting of minds."

Appellant contends appellee is estopped. She testified that approximately a year after the deed was made someone came to her house to look at the property. Assuming that the bank sent the party, she called up Carroll, its president, and asked what he meant by sending someone to look at her property. Carroll replied he had nothing to do with it, and she said she wanted a distinct understanding that the bank was to send no one out there, and no one came after that. She had occasion in February, 1927, to meet the bank's attorney. She wanted a letter from Carroll to the parole board. In March, 1927, she had a talk with the bank's attorney with reference to a conversation with the bank's vice-president in Chicago. The bank's attorney wrote her March 5, 1927, to see Carroll at once in regard to the letter to the parole board. It appears that a Mr. Stein, who was suspected of being mixed up with appellant's husband's speculations, sued the bank for $100,000 damages and the bank wanted her co-operation in securing its dismissal. The suit was dismissed and appellant notified the bank's attorney of it. The bank's attorney called appellant and told her he had orders from Mr. Fox, who was vice-president, to have her sign a deed, and that he would advise her to do it, as she knew about the letter to the board, evidently meaning the letter of Carroll to the board of paroles. Appellant told the bank's attorney that she did not see how she could do it. The paper she was requested to sign stated that she and her husband had exe-

cuted a deed to her property on the 22d day of March, 1924; that she had remained in possession through the courtesy of the bank without the payment of rent, as a tenant at sufferance, and confirming the execution and delivery of the warranty deed made March 22. In the paper appellant further agreed with the bank to hold the premises as a tenant at sufferance and to vacate and deliver possession immediately on demand. Appellant never signed the paper. Her husband was sent to the penitentiary in January, 1926, but whether the bank was responsible for it does not appear. He applied for a parole later on, and the letter from Carroll was desired to assist him in securing his parole. The letter was never written, but her husband was paroled in December, 1927. Appellant's contention of estoppel is based on the claim that the bank had admitted the deed of March 22, 1924, was invalid by seeking to have appellant ratify it and acknowledge she was a tenant of the bank at sufferance. Nothing that the bank did caused appellant in any way to change her position to her disadvantage and there is no element of estoppel in the case. Neither is there any *laches* which will affect the right of appellee to an assertion of its claim to the property.

The case is unfortunate for appellant, but the misfortune was the result of her husband's crime. The evidence shows she knowingly and voluntarily executed the deed as partial restitution. The premises were her home and were valued at $9000 or $10,000. Her husband's embezzlement, by his own admission, was over $60,000. No promises were made to appellant of immunity for her husband if she signed the deed. She admits that herself.

The decree was justified by the law and the evidence, and it is affirmed.
                                        *Decree affirmed.*