6622

SMITH v. LINDER.

1. LIMITATION OF ACTIONS—FRAUD—PLEADINGS—BURDEN OF PROOF.—In an action to set aside a deed obtained by fraud, the complaint must allege notice of the fraud within six years, but burden is on defendant to show plaintiff had notice of the facts for more than six years. Sec. 112, sub. 6, Code of Proc., governs in such case.

2. IBID.—IBID.—DEEDS.—Evidence to the effect that grantor received information that grantee claimed the land in fee under the deed executed by her, but not to the effect that grantee had imposed on her in obtaining the deed and that upon receiving this information she at once consulted a leading attorney, shows that she pursued the inquiry indicated by the notice with due diligence, and not that she had notice of facts which would reveal the fraud if pursued with due diligence.

3. FRAUD—DEEDS.—The evidence here and the form of the deed tend to show grantee imposed on grantor in obtaining its execution.

4. LACHES—ACQUIESCENCE—FRAUD—DEEDS.—Conduct of grantor after receiving information that her grantee claimed the lands in fee is consistent with the advice given her by her attorney and explains her seeming laches and acquiescence.

Before DANTZLER, J., Cherokee, January, 1907. Reversed.

Action by Nannie Smith and Edna Littlejohn against R. E. Linder. From judgment for defendant, plaintiffs appeal.

*Messrs. Butler* and *Osborne, Stanyarne Wilson,* and *J. E. Webster,* for appellant.

*Messrs. Butler* and *Osborne* cite: *Burden is on defendant to prove a statutory bar:* 52 S. C., 367; 33 S. C., 303; 4 S. C., 257; 18 S. C., 531. *Facts constituting the fraud must have been actually discovered:* 40 S. C., 443; 37 S. C., 374; 13 S. C., 384; 4 S. C., 257. *Defendant bought the fee under pretext of buying the life estate, and against this the Courts will relieve:* 20 Ency., 816, 818, 819, 828, 713; 64 S. C., 273; 57 S. C., 417. *Laches apply only where the statute would:* 26 S. C., 186; 49 S. C., 7; 55 S. C., 9; 56 S. C., 193. *As to the character of the fraud complained of here:* 24 S. C., 13; 30 S. C., 473; 14 Ency., 194; 61 S. C., 506; 1 Am. & Eng. Ann. Cas., 811-2.

*Mr. Stanyarne Wilson* cites: *There was no estoppel as consideration was inadequate:* 20 S. C., 333. *Burden is on defendant to show good faith:* 4 DeS., 697. *What section of Code applies to this case?* Code of Proc., 112, sub. 6, 118; sec. 77, N. Y. Code; 111 N. Y., 217; 137 N. Y., 374; 18 S. C., 505; 153 N. Y., 241; 21 N. Y., 205; 80 N. Y., 544. *Fraud defined:* Pom. Eq., 873, 874, 926, 927, 928, 951; 3 DeS., 283; Pom. Con., sec. 193; 44 Am. Dec., 448; 21 Ency., 37, note 5; 4 DeS., 686. *As to mistake of law and ignorance of real title:* 15 Ency., 634, 635, 638 to 644; 2 McC. Ch., 255; 1 Hill Ch., 251; 20 S. C., 322; 44 S. C., 34. *As to reformation of instruments:* 2 Pom. Eq., sec. 847; 15 Ency., 651, 661.

*Messrs. J. C. Jeffries* and *H. J. Haynesworth,* contra, cite: *Grantor is precluded by electing to hold on to transaction:* 1 Rich., 106; 24 Ency., 647; 2 Pom. Eq. Jur., 965; 11 Rich. Eq., 39. *Complaint must show plaintiff discovered*

*facts constituting fraud within six years:* 1 Hill Ch., 210, 387; 6 Rich. Eq., 145; 44 S. C., 378; Code of Proc., 112, sub. 6; 7 Rich. Eq., 44; 1 Hill Ch., 217; 6 Rich. Eq., 102; 13 S. C., 384; 16 S. C., 550. *He who charges fraud must prove it by evidence clear and explicit:* 2 Hill, 657; 164 U. S., 255; 167 U. S., 224. *Statute would not begin to run until after discovery, was limited to fraud cognizable in equity:* 40 S. C., 435; 1 Hill Eq., 410; 6 Rich. Eq.. 140; 2 Strob. Eq., 14; 8 Rich. Eq., 130; 2 McC., 426. *Fraud must be a part of plaintiff's cause of action:* 19 Ency., 247; 2 Pom. Jur., 917.

August 9, 1907. The opinion of the Court was delivered by

MR. JUSTICE GARY. The plaintiffs seek equitable relief, on the ground that the defendant fraudulently induced their testatrix to execute a conveyance, in fee, of the land in dispute, while laboring under the mistaken belief that she was only conveying a life estate.

The allegations of the complaint are substantially as follows: That by the will of Robert Lipscomb, the said property was devised to his daughter, Mary Linder, and at her death to the heirs of her body; that there was born to her, prior to 1895, as the lawful heirs of her body, the defendant, R. E. Linder, the plaintiffs, Nannie Smith, and Alice Smith, who predeceased her, leaving as her only child the plaintiff, Edna Littlejohn; that on the 15th of March, 1895, Mary Linder, in consideration of $1,000.00, executed to the defendant a deed to "all her right, title and interest in the land," the deed being to him and his heirs and assigns forever, and with the usual covenants of warranty; that the defendant is now in the sole possession of the land, and has been since the death of Mary Linder, on the           day of May, 1905; that the conveyance was obtained through the fraud and influence of the defendant, who by his great and undue influence over Mary Linder induced her to believe that her interest in the land, under the will, was a life estate,

and that, at her death, it would go to the heirs of her body—she being under the mistaken fact that her interest was as now claimed by defendant, and as then known to him, the entire estate in fee conditional, and that the deed, as executed, conveyed to him the estate in fee; that the consideration is wholly inadequate.

The prayer of the complaint is:

1. That said deed be reformed and construed to convey only an estate for the life of Mary Linder.

2. That the defendant account for two-thirds of the rents and profits, and

3. For partition.

The defendant denied the allegations of fraud, and alleged the following by way of defense: "That said deed was immediately placed upon the records of Spartanburg County, and the defendant immediately went into possession of said land, claiming the same in fee simple, and has ever so continued to possess the same.

2. "That at the time of the execution of said deed, all of the facts connected with said transaction were within the knowledge of the said Mary A. Linder, and that at said time, and certainly for longer than six years, prior to the commencement of this action, she had knowledge of all facts alleged to constitute the fraud.

3. "That the said Mary A. Linder, being possessed of such knowledge, did receive the purchase money for said land, to wit: $1,000.00, and did retain the same, and never at any time offered to return the same or any part thereof. That she acquiesced in and confirmed the plaintiff's title to said land, ratifying the said transaction and waiving any right to rescind.

4. "That the said Mary A. Linder, and the plaintiffs who claim under her, are barred by laches, and by the statute of limitations, from any right to rescind said transaction, or to sustain this action."

His Honor, the presiding Judge, sustained the defense of the statute of limitations, and dismissed the complaint solely

on that ground.    The reasons assigned by him in sustaining said defense are as follows:

"In relation to the defense of the statute of limitations, i. e., that for six years prior to the commencement of this action Mrs. Linder 'had knowledge of all facts alleged to constitute fraud,' I will quote the testimony on that point.

"Mrs. Nannie Smith, testified: 'A short time before her death she (referring to Mrs. Mary A. Linder) found out he (referring to R. E. Linder, the defendant) had a deed for the place.    Mr. Ray told her that he had a straight out deed for the land.    That was five or six years before her death. I can't remember exactly.'

"After having testified to a conversation he had with the defendant in relation to the transaction in question, R. G. Ray was asked this question: 'Now, you say that you afterwards had several conversations with Mrs. Mary A. Linder about the matter; where was it you had the conversations? A. It was at her house, five or six years ago.'

"J. R. Beason, testified: 'Q. State the time and circumstances, and what was said.    A. It was the first of April, or last of March, 1895; I was on my way to Gaffney with Mr. John J. Jones, and we met Mr. Linder at Virgil McCraw's house.    We stopped and we had a conversation, and he told us about his big land deal that he had made, bragging about how rich he was, and about how much land he owned.    I had done heard about his buying Mrs. Linder's lifetime interest, and I remarked to him that he only bought her lifetime interest, and he said, yes, but that he had a straight deed for it and that there might be a hell of a lawsuit about it, but he had a straight deed for it and would hold it.'

"On cross-examination by Mr. Haynesworth, the witness, J. R. Beason, said: 'Q. Who did you first mention this conversation to?    A. The first one I talked to was Mrs. Linder herself.    Q. How long was this afterwards?    A. I don't remember; something like two or three years.'

"On redirect examination the following was his testimony: 'Q. When you mentioned it to her, what did she

claim? A. She claimed she had sold him only a lifetime interest. I heard her tell Ed. so once. Q. What did he say? A. He said he had a straight deed and would hold it. Q. How long ago was that? A. About six years ago.'

"While there may be a doubt as to the time when Mrs. Linder was informed by R. G. Ray that defendant had a straightout deed, as tetsified to by Mrs. Nannie Smith—whether five or six years before the death of her mother—yet the testimony of J. R. Beason is sufficiently definite, I think, to show that Mrs. Linder had notice of the facts constituting the fraud for at least, and probably more than, six years before her death." * * *

The plaintiffs appealed upon several exceptions, but, in different forms, they present the question raised by the following exception: "That his Honor erred in holding as follows: 'The testimony of J. R. Beason is sufficiently definite, I think, to show that Mrs. Linder had notice of the facts constituting the fraud for at least, and probably more than, six years before her death.' The error being that the testimony of that witness, taken in its entirety, did not support the conclusion so reached by his Honor, as there was nothing in such testimony presenting any fact brought to the knowledge of Mrs. Linder upon which she could have discovered or established the fraud practiced upon her by this defendant; and further, error being that such conclusion should not have been based upon such unsatisfactory testimony of the one witness, when the great body of the testimony in the case shows that Mrs. Linder was never in possession of the facts constituting the fraud practiced upon her, or in position to establish such fraud by any facts brought to her attention."

The attorneys of the respective parties differ as to whether the provisions of section 112, subdivision 6, or section 118 of the Code, are applicable to the case.

The provisions of these sections are as follows: *Section 112, subdivision 6* (Within six years). "Any action for relief on the ground of fraud, in cases which heretofore were

solely cognizable by the Court of Chancery, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

*Section 118.* "An action for relief, not hereinbefore provided for, must be commenced within ten years after the cause of the action shall have accrued."

This Court deems it only necessary to state, that the case is to be determined under the provisions of section 112, subdivision 6, of the Code. When an action is brought for equitable relief on the ground of fraud, and a longer time has elapsed than the statute permits within which the action must be commenced, it is essential to the cause of action for the complaint to allege that the fraud was not discovered until a period within which the action may be brought; and the burden is upon the defendant to prove that the plaintiff, or the person under whom he claims, had knowledge of the fraud, or of such facts as would have led to the knowledge thereof, if pursued with reasonable diligence. *Prescott* v. *Hubbell,* 1 Hill's Ch., 215; *Farr* v. *Farr,* 1 Hill's Ch., 391; *Shannon* v. *White,* 6 Rich. Eq., 101; *Parham* v. *McCrary,* 6 Rich. Eq., 145; *McClure* v. *Ashby,* 7 Rich. Eq., 439; *Beattie* v. *Pool,* 13 S. C., 384; *Kibler* v. *McIlwain,* 16 S. C., 554; *Richardson* v. *Mounce,* 19 S. C., 482; *Harrell* v. *Kea,* 37 S. C., 369, 16 S. E., 42; *Garvin* v. *Garvin,* 40 S. C., 443, 19 S. E., 79; *Brown* v. *Brown,* 44 S. C., 382, 22 S. E., 412; *Bank* v. *Dowling,* 52 S. C., 367, 29 S. E., 788; *deLoach* v. *Sarratt,* 55 S. C., 254, 33 S. E., 2; *Toole* v. *Johnson,* 61 S. C., 41, 39 S. E., 254.

The testimony does not show that Mary Linder had actual knowledge of the fraud, but the defendant contends that she had notice of facts, which if pursued with due diligence, by a person of ordinary prudence, would have led to a discovery of the fraud six years prior to her death.

In the first place, it seems to us that his Honor, the Circuit Judge, erred in his finding of fact, that Mary Linder received

the information mentioned in the testimony of J. R. Beason six years prior to her death. That witness testified that he did not remember, and only undertook to state the time approximately. He, however, said she went to Spartanburg after his conversation with her. There was, also, other testimony to the effect that when R. G. Ray gave her similar information she was very much worried, went to Spartanburg and consulted an attorney as to her rights. This was five or six years before her death. It is but reasonable to suppose, that if she had the conversation with Beason prior to that time, she would have gone at once to consult an attorney. It must be remembered that the burden of proof was on the defendant.

But, conceding the fact that she received the information from Beason six years before she died, let us analyze it and see what it contained. It was simply, in effect, that he had a title in fee, and intended to hold the land at all hazards, but no fact was stated indicating that the defendant had imposed on her by fraud.

In the case of *Cuningham* v. *Cuningham,* 20 S. C., 317, 332, the Court recognizes the doctrine that, where there is an error common to both parties, in the construction of a deed or will, it affords no ground for equitable relief, in the absence of fraud or imposition. In that case the Court quotes with approval the following language of Chancellor Dargan, in *Keitt* v. *Andrews,* 4 Rich. Eq., 349 : "The simple misconstruction of a will or deed, where there is no fraud or circumvention, cannot be regarded in any point of view as coming within the scope and authority of those cases where mistakes of law, in contradistinction to ignorance of law, have been considered as affording grounds for relief. It is a cardinal theory of the law, founded upon a necessary policy, that every one is presumed to have knowledge of its principles. This presumption prevails as well in reference to civil rights as in the criminal Code. Without this doctrine, no system of law can practically fulfil the ends of its institution."

Mary Linder, however, did not remain inactive, but consulted a prominent attorney in pursuance of the knowledge she had acquired, as to the rights claimed by the defendant. The question, therefore, is not whether the facts were sufficient to put her on inquiry, but whether she pursued such inquiry with due diligence; and the testimony satisfies us she did.

The exceptions raising this question are sustained.

The respondent's attorneys gave notice that they would ask this Court to sustain the decree on the additional grounds: (1) That there was no fraud in the transaction; and (2) that Mrs. Linder, by retaining possession of the consideration, and acquiescing in the transaction, has elected not to repudiate it, and is barred by laches.

We proceed to consider first whether there was fraud.

R. G. Ray testified as follows: "Q. Do you remember about the time this deed was made from Mrs. Mary Linder to R. E. Linder? A. Yes, sir; I remember the day he said he had got it. Q. Now, then, prior to the date this deed was made, state what R. E. Linder said to you, if anything, as to his intention regarding this land. A. I will state as near as I can what I remember about it. Some time before this deed was said to have been made, he talked to me about getting the deed and making the trade. He went on to say that he thought he was entitled to that land down there and ought to have it, and that he had a deal to make that he thought would work all right, if he could get it to work like he had it in his mind. He said that his mother was under the impression that she only had a life estate in that land under her father's will, and that he had the will examined by attorneys, and that he found that that entailment didn't hold good, that it was null and void, and that if he could get her to sign a deed of any kind that he would be all right. Well, he went on to say that Benson and Spurgeon ought not to have any of it anyhow. Q. Did he say anything about his intention of fooling the old lady? A. Yes; he said

that if he could get her to sign the deed he could work the
trick and hold the property.　Q. All right, after it was made,
state what conversation you had with R. E. Linder.　A.
Well, he told me that he had got that trick worked, and had
the deed fixed, and he thought he had it so it would take
them a damn long time to get it; that he expected to be
deviled, but that they would have a long fight to get it.
Those were the words he spoke.　Q. Did he not say how
much he made in that deal?　A. He said he had made about
ten thousand dollars in that day's work, and that it had made
him rich.　Q. Was there anything about who he dreaded
in the transaction?　A. Yes.　Q. Just tell what he said.
A. After Nathan Littlejohn married into the family, which
was some time after the first transaction that the deed was
made, he said that he was looking for some trouble now,
that Nathan Littlejohn had got in there, and that he had
brains and money, and he dreaded the two together.　That
was just what he said.　Q. Did you ever tell him about what
you thought about him working the trick on the old lady?
A. I do not know how much was said about it.　I told him
he ought not to work that kind of trick on his old mother.
I had several conversations with him.　Q. What did he say?
A. He said he had it all right, that they would have to fight
for it.　O. What estate did he say the old lady intended to
convey to him?　A. Life estate in the Bob Lipscomb land.
That was my understanding.　Q. Did you talk to him fre-
quently about this matter?　A. Yes, sir; he talked to me
fifty times about this matter, both before and after.　Very
often when he had a drink ahead; that was when he talked
most.　Q. Did you ever hear Mrs. Linder say what she had
conveyed to him?　A. Yes, sir; her life estate.　Told me
time and again that that was all that she intended to convey
to him.　She even got me to go to Spartanburg on one
occasion to see if she could not enter suit and have it back."

W. L. Self testified as follows: "Q. Do you know R. E.
Linder?　A. Yes, sir.　Q. How long have you known him?
A. Ever since I was a boy.　Q. Went to school with him?

A. Yes, sir.   Q. Been intimate with him since that time?
A. Yes, sir.   Q. What, if anything, did you hear him say
regarding the land that was deeded to him by his mother?
A. About three or four years ago last fall, me and him went
to Spartanburg, and on our way back he was bragging how
rich he was, what a fine plantation he had here before Gaff-
ney; and I said yes, I heard Mr. Littlejohn say he was going
to devil you after your mother died; and he said yes he
expected that.   He said he had a straightout deed signed
up; that she signed it; that she thought she was signing her
lifetime interest, that he fooled her."

Furthermore, the form in which the deed was prepared
was suspicious, and the circumstances attending the execu-
tion of the deed tended to show that the defendant imposed
upon his mother.

This ground is therefore overruled.

We will consider next the second of the additional
grounds:

Nannie Smith testified as follows: "Q. Did she continue
to believe that she only had a life estate?   A. She went to
Mr. Carlisle, it worried her so much.   Mr. Carlisle told her
to just state the case as it is, and she did so; he said,
Mrs. Linder, you have only a lifetime interest in the
place, and nothing can be done until after your death.
Q. And she acted on his advice and continued to believe she
only had a life estate?   A. Yes, sir."

R. G. Ray testified as follows: "Q. After she told Mr.
Carlisle as to what took place when the deed was signed,
and the understanding between her and him, and as to what
kind of an estate was being conveyed by that paper, what
did Capt. Carlisle tell her?   A. He told her that she had
made a deed, and that he did not know that she could do
anything during her lifetime, but that her heirs could take
action after her death.   Q. What was Capt. Carlisle's advice
as to the situation?   A. He told her that if she had only
deeded him a lifetime interest that, of course, it would hold
good, and that her heirs would have a chance at it after her

35—77

death.    Q. And she acted on that advice?    A. Yes, sir.    Q.
You went with her?    A. Yes, sir; Mrs. Smith was along.
Q. And Capt. Carlisle gave that advice under the informa-
tion he received from Mrs. Smith and Mrs. Linder, as to
what had taken place when the paper was signed?    A. Yes,
sir.    Q. And the old woman was much relieved when she
got that information?    A. Yes, sir; she seemed very much
better satisfied."

The conduct of Mrs. Linder, after she consulted Mr. Car-
lisle, was consistent with the advice whice he gave her, and
explains her seeming laches and acquiescence.

This ground is also overruled.

It is the judgment of this Court, that the judgment of the
Circuit Court be reversed.