NATIONAL BANK OF SAVANNAH v. ALL.

(Circuit Court of Appeals, Fourth Circuit. April 4, 1919.)

No. 1679.

1. DEEDS ⊕➡71—VALIDITY—DURESS.
   A conveyance made by a mother for the purpose of securing an indebtedness of her son, with knowledge that in incurring the indebtedness he had committed a criminal offense and with intent to prevent his prosecution, is not for that reason invalid as for an illegal consideration, where not induced by any threat of prosecution or promise of immunity.

2. DEEDS ⊕➡211(5)—EVIDENCE—DURESS.
   Evidence held insufficient to warrant cancellation of a deed executed by complainant to secure an indebtedness of her son, on the ground that it was induced by threats of prosecution of the son by the creditor, which placed her under duress or prevented the exercise of her own free will.

3. CONTRACTS ⊕➡138(2)—RIGHT TO RELIEF IN EQUITY—PARTIES IN PARI DELICTO.
   One party to a contract, the purpose of which was the compounding of a felony, and which has been carried out by the other party, will not be relieved from the contract in equity.

4. LIMITATION OF ACTIONS ⊕➡37(4)—SUIT FOR CANCELLATION OF INSTRUMENTS —"ACTION FOR RELIEF ON GROUND OF FRAUD."
   A suit for cancellation of a deed as executed under duress is one for relief on the ground of fraud, and is barred in six years from discovery of the fraud, under Code Civ. Proc. S. C. 1912, § 137, subd. 6.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Action for Deceit or Fraud.]

5. ESTOPPEL ☞94(1)—PERMITTING MORTGAGE OF PROPERTY.

Where complainant executed a deed to property to enable the grantee to mortgage the same to secure a debt of her son, and permitted the mortgage to be foreclosed without objection, she is barred by laches from thereafter maintaining a suit for cancellation of the deed on grounds of which she had knowledge at the time it was executed.

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. M. Smith, Judge.

Suit by T. Gertrude All against the National Bank of Savannah and another. Decree for complainant (250 Fed. 120), and the Bank appeals. Reversed.

Edward S. Elliott, of Savannah, Ga., and E. M. Blythe, of Greenville, S. C. (Jacob Gazan, of Savannah, Ga., and B. F. Martin, of Greenville, S. C., on the brief), for appellant.

Charles Carroll Simms, of Barnwell, S. C. (J. W. Vincent, of Hampton, S. C., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This case was brought in the court of common pleas of Barnwell county, S. C., and removed to the District Court of the United States for the Eastern District of South Carolina.

T. Gertrude All, on February 9, 1917, filed her bill against Harry W. All, a resident of the state of South Carolina, and the National Bank of Savannah, a corporation organized under the banking laws of the United States and a resident of Savannah, Ga. The appellee was the owner and in possession of the river plantation, containing 2,-592 acres, more or less, in Bull Pond township, Barnwell county, S. C. That in August, 1910, plaintiff was approached by her son, John E. All, and an agent of the National Bank of Savannah, and requested to make such bank a mortgage to prevent it from prosecuting her son for a crime under the laws of Georgia, which was refused. That shortly thereafter, on threats being repeated by the agent, and to prevent the prosecution, arrest, and imprisonment of her son, she consented to and did execute and deliver to her son, Harry W. All, a deed conveying the land in question, which was duly recorded in Barnwell county, S. C., in order that Harry W. All might make and deliver to the bank a mortgage on the property to prevent the threatened prosecution. That appellee was not indebted to the said All or to the bank, and that the deed was made solely for the purpose of preventing the bank from carrying out its threat of having John E. All prosecuted, arrested, and imprisoned. That for the same purpose only Harry W. All made a mortgage to the bank for the sum of $15,000, the said Harry W. All not being indebted to the bank. The appellee "is and has been in possession of these lands, and the defendants are not and have not been." It is further alleged that the deed and mortgage are void and should be canceled as a cloud on the title of plaintiff.

The answer of the bank is substantially as follows: It admits that it is a corporation, and it denies all other allegations, except as admitted.

It admits the indebtedness of John E. All to the bank, and the execution of the deed and mortgage, and that Harry W. All took the proceeds from the mortgage and applied the same to the indebtedness of John E. All to the bank, but expressly denies that the mortgage and deed were procured by threats or representations made by it, or that it ever made any threats whatever. That subsequent to the making of the deed and mortgage the bank brought its action in the District Court for the foreclosure of the mortgage made by H. W. All. That it obtained a decree for sale. · That the land was sold, and bought in by the bank and deed was made to it, and it went into possession of the same, and in addition to the decree for the sale of the land it obtained a deficiency judgment against Harry W. All. The plaintiff had full knowl·edge of the foreclosure proceedings and acquiesced in the same, and is now estopped to maintain an action for title or possession of the bank for the lands.

It is further averred that the cause of action accrued more than six years prior to the commencement of this action, and is therefore barred by the statute of limitations; that the deed and mortgage were executed for the purpose of paying a debt of John E. All, son of the plaintiff, to the bank, and was based on a good and valuable consideration; that if deed was made to suppress prosecution, which defendant denies, plaintiff was a party to the transaction, acquiesced in it for more than six years, the contract has long been executed, she was particeps criminis in it, and the court cannot lend its assistance to her to repudiate this transaction.

Harry W. All filed no answer. The court below entered decree canceling the deed in question, to which plaintiff excepted, and the case now comes here on appeal.

The first question that arises in this case is as to whether the appellee has by a preponderance of the evidence established the allegations of the complaint; the gist of the complaint being that she acted under duress in signing and executing the deed in question. Of course, there is the question as to the consideration moving her at the time she made the deed; but the first and most important question is as to whether she executed the deed of her own free will and volition. We will briefly review the evidence in order that we may properly determine this phase of the question.

The first witness offered by the appellee was her husband, J. H. C. All, who said, among other things, that he had collected the rents for the current year, and every year that his wife had owned it; had paid all taxes except last year; that his son got into financial difficulties in Savannah, and that Mr. Gazan, attorney for the bank, had gone to his residence to see him; that he said he came there by instruction of the bank; that the bank was going to prosecute his son for obtaining money under false pretenses; that he communicated this fact to his wife, and told her that the son would be prosecuted if something was not done; that he suggested she would have to make title to the bank to save the boy from the chain gang or the penitentiary; that he obtained this information through Mr. Gazan and from what· his ·boy wrote him.

On cross-examination he said that Mr. Gazan brought "a lot of papers" for her to sign, but he would not let her sign them, most of them. "Gazan did not state that the bank only wanted me to pay the money due by J. H. C. All & Son. We met in Mr. Patterson's office at Barnwell. The understanding was she was to keep the boy out of trouble by parting with the real estate. I was just trying to see that she didn't get tangled up. I got a lawyer to help her." He also said that the national bank had never brought suit against him, and that John All did not make representations to her (meaning his wife) about signing the deed; further that the deed was prepared by her lawyer and carried back to her, and she signed it at Allendale and gave it to H. W. All.

Percy All, a son of the appellee, testified, among other things, that Mr. Gazan and the cashier of the national bank sent for him in reference to the transaction of John E. All with that bank, and when he arrived they told him that they intended to institute criminal proceedings against John E. All, as he was short a considerable sum of money, and the directors had instructed them (Garrard & Gazan) to do so, and that he wrote his father about it. He also testified that this conversation occurred in the office of Garrard & Gazan; that in addition to Garrard and Gazan, Mr. Bloodworth, the cashier of the bank, and also Mr. Hughes, were present. He said they told him that John E. All was short a considerable amount of money, and that they intended to prosecute him criminally immediately, unless something was done; that he wrote his father of the matter; that he was again called to the bank, and that, from the tone of the letter received from his father, he suggested that Mr. Gazan go to Allendale and see his father; that the whole effort on the part of those gentlemen was to secure payment by threatening prosecution, and that that was their purpose in sending for him.

Harry W. All, a son of Mrs. T. Gertrude All, said, among other things, that no consideration passed to him for the execution of the mortgage to the bank; that he signed the notes also, but was not indebted to the bank, and the mortgage was made out solely to prevent the bank from prosecuting his brother; that the mortgage was made to him, and he took the same to Savannah to "fix it up," as the bank wanted it with the intention of keeping his brother out of jail. He testified on cross-examination as follows:

"Q. Mr. All, when you delivered the mortgage to the bank that day, didn't the bank execute to you a check for $15,000, and didn't you then and there indorse that check to the bank, to be applied to this debt of J. H. C. All & Son? A. Gave me a check for $15,000?

"Q. Yes. A. No; I don't remember about that. I signed some notes.

"Q. Will you swear that they didn't deliver to you the check? A. No; I don't swear; it might have been among the notes."

Mrs. T. Gertrude All testified that she was the owner of the land in question and had executed the deed to her son Harry W. All, so that he could go down and settle with the bank, and thus keep her son out of trouble. She testified that she could not recall the conversation Mr. Gazan had in the parlor at Allendale; that her husband told

her that, unless the deed was made, her son John E. All would be prosecuted and sent to prison for a criminal offense; that she did not make the deed for a money consideration, but made it to keep her son out of jail and trouble; and that if it had not been for the threats of Mr. Gazan, as agent for the bank, she would not have made the deed.

J. H. C. All, being recalled, said that the reason they did not bring the action sooner was that the bank undertook to foreclose the mortgage, and that his son was opposing it on the ground that "it was settled or paid, and until that was settled we did not bring this suit earlier. I was looking after the matter for Mrs. All."

This constitutes the evidence relied upon by the appellee to sustain her contention.

The defendant offered the evidence of Jacob Gazan, who testified that he was a member of Garrard & Gazan and was general counsel for the national bank. He said that Percy All had suggested to him that he thought he would be able to obtain some money as security, through his father and mother; that on July 28, 1910, at the request of the Alls, he went to Allendale, to the house of Mrs. J. H. C. All; that there he "recited the facts about the matter," and it was agreed that Mrs. All would give a mortgage on the river place to secure $15,000 of this indebtedness; that at that time there was no mention of criminal prosecution by himself or any one else, and that there never had been in his conversations with the bank officials any suggestion of a criminal prosecution; that his firm's services were only on the civil side of the matter; that he prepared the mortgage and notes and sent them to Allendale, but they were not satisfactory; that he then went to Barnwell, where Mr. All met him in the office of Mr. Patterson, at which time Mr. All said that he was acting with Mrs. All; that they discussed how the matter could be arranged so that, in the event the river place should not on a foreclosure produce the money for which it was secured, "that there would be no personal liability on Mrs. All beyond the river place. She was willing to give up that place, but did not wish any other of her property involved." That her attorney, Mr. Patterson, evolved the plan solely on his own initiative, by which Mrs. All should deed the river place to her son Harry W. All, who in turn could deal with the place as his own and make such agreement with the national bank as might be satisfactory between him and the officers of the bank. A part of the plan was that Mrs. All should not lose more than the river place; that everything was agreed upon, except the drawing of the deed; that at this juncture, Mr. J. H. C. All said:

"Well, now, before we close this matter, I want you to give me a writing that there will not be any prosecution of my son."

Witness in reply said:

"Why, Mr. All, we have never discussed prosecution either with you, with the bank, or any one else. I am not here on any criminal side of the case. I am here solely for the purpose of obtaining such security as we can for as much of the debt as possible."

Witness then said:

"If that is your attitude, we stop where we are."

, Mr. Patterson, who, as we have said, was attorney for Mrs. All, replied:

"Mr. All, there has been nothing said here about any criminal prosecution, and that is a matter which only the future can take care of," or words to that effect.

Then Mr. All expressed satisfaction with the situation. Mr. Patterson then prepared the deed for Mrs. All and Harry W. All. A few days thereafter Harry All went to Savannah and took the deed. By agreement Harry All executed a mortgage for the bank, not only of the $15,000 to secure All & Sons' indebtedness, but also the entire indebtedness of J. H. C. All & Son to the bank. The witness drew the mortgage and notes, and they were executed, and H. W. All executed a note for $15,000, and that amount was applied on account of the indebtedness.

The witness explicitly denied that he ever threatened any prosecution, or was ever present where any prosecution was ever mentioned, except in the manner just related in Mr. Patterson's office.

On cross-examination the witness said:

"If a man pledges cotton, and instead of cotton there are linters, I would say that would under the law of Georgia constitute crime of obtaining money under false pretenses. It is also a crime to compound a felony, and in my 27 years at the bar I have always been very careful not to come within the purview of that statute."

Witness also testified that the information as to the transactions of J. H. C. All & Son came to their firm more particularly in connection with their investigation as to what rights the bank had against oil mills who had falsely billed the linters as cotton. He further stated that John E. All claimed that he had done no wrong, as he had invented a machine by which he combed out linters—straightened the fibre, and he would take about one-third linters and two-thirds cotton, and in another machine which he had invented he would mix the two products together in a bale and sell it as cotton. He further stated that he thought he could get his mother to help him, and we told him that the matter was of no consequence to us, where it came from; that what we wanted was to get the money; that the circuity of the conveyance was the result of Mr. Patterson's advice and Mr. All as the representative of Mrs. All; that the first agreement was that she should give the mortgage to secure $15,000 on her river place, but it occurred to her that if the place should be foreclosed, and deficiency resulted, she would be liable; that Mr. All conferred with Mr. Patterson, and in that way the plan executed was evolved; that there was nothing said in Allendale in regard to the criminal liability of Mr. All; that witness had never even discussed it with the bank officials, and had never investigated the criminal law as to a prosecution; that the limitation against criminal indictment of this character is four years.

On re-direct examination the witness said that the bank became the purchaser at the foreclosure sale in the case of Bank v. Harry W. All (D. C.) 250 Fed. 120, bidding for and buying in the land in the name of the bank; that at Allendale Mrs. All agreed to execute deed and

mortgage and he prepared papers when he came back; that Mr. J. H. C. All represented Mrs. All there as far as he knew; that there was a substitution of the final agreement for the original one.

The judgment roll in the case of National Bank of Savannah v. Harry W. All was introduced.

J. O. Patterson, Jr., was introduced by defendant, who testified, among other things, that he was an attorney at law and resided at Barnwell, S. C. According to his recollection he drew the deed from T. Gertrude All to Harry W. All, dated August 28, 1910; that he was consulted by Mr. J. H. C. All, and he advised him not to allow his wife to execute the mortgage to the bank, for the reason that in his opinion the land would not bring the debt and that the bank would then procure a deficiency judgment against her; that after talking the matter over with Mr. All and Mr. Gazen it was agreed that the deed should be made by Mrs. T. Gertrude All to Harry W. All, and that he prepared the deed and turned it over to Mrs. All; that he discussed the matter with Mr. All before he communicated it to Mr. Gazan; that he could not say that he advised Mr. All to execute a mortgage to the bank, but advised Mr. All not to allow his wife to execute any mortgage, for the reason that she was solvent and that the land proposed to be mortgaged was not worth the amount of the mortgage debt in his opinion; that Mr. All accepted his advice and did not allow his wife to execute the mortgage; that he knew that the purpose was to secure the bank; that he did not remember as to what he advised Mrs. All, but that he thought possibly that he stated this, i. e., that after the deed was executed to Harry W. All he could deal with the bank as he saw fit, and she would not be responsible for the consequences; that he could not say that he heard any threat of prosecution; that the transaction was rather vague in his mind; that he could not say that the criminal business was not discussed, nor could he say that it was; that he could not say that Mr. Gazan's testimony that the whole matter would be off "if you insist on an agreement not to prosecute" is correct or not; simply did not remember.

F. J. Bloodworth was then introduced for the defendant, and testified that he was cashier of the national bank when these things happened with the Alls; that there were daily transactions of various kinds with the Alls; that they had a large note of about $60,000, and they discovered the Alls had given bills of lading which called for cotton, but were really for linters; the pledge was made by either John E. All or his agent, Mr. House Hughes; that there was a proposition made to the bank to secure a portion of the indebtedness by Mr. Harry W. All giving a mortgage in the sum of $15,000 and by making certain other arrangements in connection with it; "that was done;" that the board of directors did not at any time, to his knowledge, direct or authorize a criminal prosecution in connection with that transaction; that nothing like that appears on the notes; that he was secretary of the board, and would have known if such action had been taken. There was no threat of criminal prosecution at the meeting in the office of Garrard & Gazan that Mr. Percy All attended. The witness stated that he would say positively that there was no such threat made

at any meeting that he attended; that so far as he knew no officer of the bank directed the attorney to institute criminal proceedings; that Harry W. All gave note and mortgage aggregating $15,000, for which witness gave him a cashier's check, which All indorsed, and the amount was by his direction placed to the credit of the indebtedness of J. H. C. All.

On cross-examination he stated that he was not a lawyer, but that he thought John E. All had violated the criminal law, and that he did not know that any influence was brought to bear upon the mind of John E. All, or any of his family; so far as he knew there was no proposed prosecution; that he talked with the president about the prosecution, and the opinion was expressed that he ought to be prosecuted, but there was no action of that kind taken, and no agreement to prosecute him.

William Garrard was then introduced as a witness for the defendant, and stated that he had been a practicing attorney in the city of Savannah since 1886 or 1887; that at the time of all these transactions with the Alls his firm represented the national bank, but that he particularly had charge of it; that he was present at the meeting at his office with Mr. Percy All and others; that at that meeting there was no threat of criminal prosecution against J. H. C. All, John E. All, or any one else with reference to it; that he was at a number of directors' meetings and met the officials of the bank, and not one of them ever directed or authorized him to institute criminal prosecution; that the sole purpose of the bank was to collect its money if it could, or as much of it as possible; that the statement of Percy H. All as to what occurred in his office, to wit, that it was done under threat of prosecution, was absolutely untrue; that in the whole matter the attitude of the bank to John E. All as a criminal cut no figure at all; that if any instructions had been given by the bank that they would have been given to him, and that he would have followed them, but none were given.

In addition to this, W. Q. Hughes, clerk and attorney in fact of All & Son, testified as follows:

"Q. Had there not been a warrant taken out for the junior member of that firm? A. I never heard of it.

"Q. By this bank, by the officers of it? A. I never heard of it.

"Q. Was that mortgage given as a condition that the prosecution should not be pressed? A. Not that I know of.

"Q. You do not know anything, then, about any criminal prosecution against John All; that is his name, isn't it? A. No, sir; I know nothing about it: John E. All."

It is reasonable to assume that, if there had been any threats to prosecute, this witness, owing to his relation to the firm of All & Son, would have had knowledge of the same. The foregoing is, we think, a fair statement of the facts bearing upon the contentions of the parties in the court below.

As we have stated, appellee bases her suit upon the theory that she was under duress by virtue of the threats to prosecute her son, and therefore did not exercise her own free will at the time she conveyed the land in question to her son Harry W. All. However, the court

below failed to find that the appellee was under duress at the time that she executed the deed. In referring to this phase of the question, the court stated that under the South Carolina decisions "it is not a question of duress, but a question of the illegality of the consideration of the contract."

It is well settled that, where one seeks to cancel a deed or other written instrument upon the ground that the grantor was under duress at the time of the execution of the same, it must affirmatively appear that the execution of such deed or instrument was procured by threats or undue influence. The court below, in referring to the ground upon which it based its decision, said:

"In the present case it is found as a conclusion of fact that the National Bank of Savannah, through its officers, under the circumstances of the case, was reasonably charged with the knowledge that the motive actuating the complainant in making the deed of conveyance to her son Harry W. All was to save her son John E. All from criminal prosecution, and it is further found as a conclusion of law that that deed of conveyance is, as against the defendants Harry W. All and the National Bank of Savannah, null and void."

When the matter was before the court for rehearing, the District Court also said:

"Where the machinery of the law and the administration of public justice is not set in action by those who should do so because of some financial benefit to inure to the party who should be the prosecuting witness, it is another thing; and it is not the result which the law desires to allow consummated."

The decision of the court as to this point may be epitomized as follows:

(a) That the conveyance was illegal, because the motive influencing Mrs. All was to save her son from prosecution.

(b) Appellant was reasonably charged with knowledge of such motive.

(c) Appellee's son was guilty of a crime.

(d) His guilt was known to all.

(e) The bank was active in obtaining the deed, and it is further insisted by counsel for appellee that the fact that the appellee's son was not prosecuted is a strong circumstance tending to show that the conveyance was illegal.

[1] The question therefore arises as to whether the evidence is such as to warrant the court in the finding that the consideration was illegal. It is true that the evidence of the appellee and her witnesses tends to show that she was under duress at the time of the execution of the deed; but does the whole evidence, and especially when we consider the evidence offered by the appellant, warrant the finding that the appellee at the time she executed this instrument, executed the same on account of the threats made by the bank or its agents to prosecute and imprison her son?

In order to arrive at a correct conclusion as respects this point, we must consider the transaction as a whole, and when we do this we find that the evidence offered by appellee is wholly inconsistent with the position she now takes. The characters of the attorneys who testified in this case are good. Two of the witnesses are members of a

reputable firm of attorneys, and we feel that full credence should be given to their testimony, and this is especially true in view of the conduct of the appellee. At the inception of the whole matter she knew that the conduct of her son had been such as to render him liable in the event he should be prosecuted on a criminal charge. It was but natural that she should feel a tender solicitude for her son, and that she should be desirous of shielding him from imprisonment. This was a laudable sentiment, and one that would be entertained by any mother under such circumstances, even though no one had ever intimated that it was proposed to institute a criminal action. In nine cases out of ten, any father or mother, knowing that a child was liable to a criminal prosecution, would not have hesitated a moment to do anything that might save the child; but where it appears that such action on the part of the parent was due to the knowledge of the fact that her son had committed a crime, and not owing to any threat to prosecute him, it could not be held sufficient to invalidate any paper that is executed.

As we have stated, the court did not find as a fact that she was deprived of her own free will, and therefore executed the deed under duress, which we think conclusively determines this case adversely to the contention of the appellee. The evidence of Mr. Gazan, which is plain and explicit, clearly shows that no effort was made by the bank to intimidate or coerce appellee, and the testimony of Mr. Gazan is strongly corroborated. It affirmatively appears that the first point raised by the appellee and her husband was that she was anxious that a plan might be adopted by which she was not to be liable beyond the value of the river place. This matter was finally adjusted by a plan worked out by her own counsel, Mr. Patterson. After this point had been adjusted, it appears that the husband inquired as to whether, as a condition precedent to the signing of the deed, the bank would give him a paper writing stating that there would not be any prosecution of his son, and in reply to this proposition Mr. Gazan made it very plain that he was not there to discuss the criminal side of the case, and that the only motive he had was to secure as much of the debt as possible; and, continuing he stated, "If that is your attitude, then we stop where we are;" and the statement of Mr. Patterson, who was then and there representing appellee as her counsel—i. e., "Mr. All, there has been nothing said here about any criminal prosecution, and that is a matter which the future only can take care of"—is very significant and corroborates the evidence of Mr. Gazan.

Deed was prepared by Mr. Patterson, as attorney for appellee, in pursuance of the instructions that she gave him, and the terms of the same are plain and explicit, and could have left no doubt upon her mind as to the real import of the transaction. There were five persons present at the time the deed was executed, four of whom corroborated the evidence offered by the bank as to this point. It is further insisted that it is significant that the appellee did not bring her action to set aside the deed until after the statute of limitations applying to the offense with which her son was charged, had expired.

In order to bring this case within the rule announced by the court below, it must appear that the bank threatened a criminal prosecution

of the son, or did something that created the impression upon the mind of the mother that, unless she signed the deed, her son would be prosecuted and imprisoned. It was but natural that she should have realized the enormity of the crime which her son had committed, and being anxious to save him from punishment she executed the deed; but unless it can be shown that the bank not only threatened such prosecution, but also agreed not to prosecute the son, it could not be said that her act was not that of her own free will.

The second assignment of error is to the effect that the court—

"erred in not holding specifically that, even if the purpose of Mrs. All in executing deed to Harry W. All was to prevent a criminal prosecution against her son, John E. All, such state of mind was not brought about by any act of this defendant, was not known to it, and that its sole purpose in the transaction was to obtain security for a debt justly and legally owing to it by John E. All, son of this defendant, and that this defendant had no reason to expect that the purpose of Mrs. All in executing the deed was other than to secure the debt of her son."

The evidence above quoted applies with equal force to this assignment, showing as it does, we think, most conclusively that the bank did nothing to bring about the state of mind of Mrs. All which prompted her to sign the deed. The real question agitating the mind of Mrs. All was as to whether she would become liable for any amount of the debt that might remain unsatisfied after the sale of the land upon which she was to give the mortgage to the bank, and that the fact that the advice given by her attorney, Mr. Patterson, was accepted by the appellee's husband, upon which she acted, clearly indicates that that point was the one thing about which her mind was in doubt. The following question and answer of the witness Patterson seems to settle that question beyond peradventure. The witness was interrogated as follows:

"Q. But the final transaction that was made upon your advice as attorney for Mrs. All? A. I will say that Mr. All accepted my advice, and he did not allow his wife to execute that mortgage."

This clearly shows that in any preliminary steps that were taken by the appellee she was guided solely by the advice of her attorney, and it is but reasonable to assume that the point we mention was the one in which she was unsettled in her mind and about which there is not a scintilla of evidence to show that the bank either directly or indirectly undertook to influence her in that respect; in other words, we think that the fact being established that she only wanted to guard against any liability that might occur against her personally tends strongly to show that she had made up her mind that it was her duty as a mother to become security for her son, provided she could have this point cleared up, so that she might know what she was doing.

On the third assignment of error it is insisted that the court—

"erred in not holding specifically that, in order to avoid the deed executed by plaintiff, it was necessary for her to show, not only that it was without consideration, but also that she was caused to execute the deed by such duress, expressly or impliedly exerted upon her by this defendant, as would result in her being compelled to execute the same through fear of prosecution of her son, and not as an act of her own free will."

In other words, that the Court erred in not holding that the—

"preponderance of the testimony showed that no such duress had been exercised upon the plaintiff by the bank or any of its agents."

We have already, in referring to the other assignments of error, fully covered this point. However, we will group the third and fourth assignments of error together in order that we may discuss them at the same time.

[2] Here we have the deed of Mrs. All as the final result of the negotiations between her and the bank, or its agents, and it clearly appears from all the testimony that before she executed the deed she took such steps as an ordinarily prudent person would take in order to safeguard her interest; and under these circumstances can it be found from the testimony that there were such threats to prosecute her son as to deprive her of the exercise of her own free will and thereby render her incapable of giving her legal assent, or whether there was no legal consideration moving her to execute the instrument in question?

It should be borne in mind that no warrant was issued, nor does it appear that any steps were taken to secure a warrant, or to restrain the defendant from his liberty, on account of the transaction between the son and the bank; therefore we must conclude that there was no criminal procedure imminent at that time against John E. All.

In 14 Cyc. 1123, it is stated that duress is—

"a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition."

In United States, Lyon et al. v. Huckabee, 16 Wall. 414, 431 (21 L. Ed. 457), the Supreme Court said:

"* * * If there be compulsion, there is no binding consent, and it is well settled that moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is sufficient in legal contemplation to destroy free agency, without which there can be no contract, because in that state of the case there is no consent. Unlawful duress is a good defense to a contract, if it includes such degree of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness."

It is further significant that Mrs. All, after the conference with Mr. Gazan, was given ample time in which to determine what she should do, and it must also be borne in mind that when the parties met at Barnwell she had her representative there in the person of her husband, who assented to the transaction. The lower court, among other things, said:

"It is found as a conclusion of fact that the National Bank of Savannah, through its officers, under the circumstances of the case, was reasonably charged with the knowledge that the motive actuating the complainant in making the deed * * * was to save her son * * * from criminal prosecution."

While these findings pertain to the question of duress, they certainly have no place in dealing with the consideration of the contract. In 9 Cyc. 320, it is said:

"Motive and consideration must be distinct, for they are not the same thing. The fact that there is a motive for a promise does not provide the element of consideration."

It is insisted by counsel for appellant that, inasmuch as there was an extension of the indebtedness of John E. All during the period of 1910 to 1914, this in itself would be sufficient legal consideration, and, in the absence of a promise on the part of the bank to compound a felony, would not vitiate the contract for lack of consideration.

It is conceded that John All secured a credit by his mother becoming security for him.

"A benefit to a third person is a sufficient consideration for a promise." 9 Cyc. p. 316, and cases cited.

Extension of time for the payment of a debt or the performance of an agreement is a sufficient consideration to support a contract. 9 Cyc. p. 338, and cases cited.

Admitting that Mrs. All realized the fact that her son had violated the criminal law and was actuated by a desire to save him harmless from prosecution of such offense, this would not be sufficient in the absence of proof that the bank had agreed not to prosecute the son in the event the mortgage should be given, and that the bank had no knowledge of the cause moving her to execute the deed in question, to invalidate the deed. This principle is well settled in the case of Moyer v. Dodson, 212 Pa. 344, 61 Atl. 937, in which the court, among other things, said:

"There is nothing in the contention that the mortgage was given to stop a threatened criminal prosecution against Dodson. Prior to and at the time the agreement and mortgage were executed no prosecution had been brought against Dodson. While he testifies that the plaintiff and the latter's counsel told him he would be prosecuted if he did not obtain the mortgage, it was not shown, nor is it even claimed, that the plaintiff or his counsel agreed not to prosecute if the mortgage was given. The contract would not be vitiated unless the plaintiff agreed to abandon or suppress the prosecution against Dodson. Johnson v. Allen [22 Fla. 224], 1 Am. St. Rep. 180; Cass County Bank v. Bricker [34 Neb. 516], 52 N. W. 575, 33 Am. St. Rep. 649."

Also in the case of Fosdick v. Barnarsdale, 74 Mich. 302, 41 N. W. 931 (1889), the court held that, in order to make a note void, the alleged understanding that the plaintiff would not appear or prosecute the case against the defendant should have been the understanding of the plaintiff as well as the defendant.

In Bankhead v. Shed, 80 S. C. 253, 61 S. E. 425, 16 L. R. A. (N. S.) 971, 15 Ann. Cas. 308, the Supreme Court, in referring to this phase of the question, said:

"Moreover, in this case, there was no duress by imprisonment and no prosecution had even been begun. At most there was a mere threat to prosecute under a void statute."

After a careful examination we fail to find any decision of the South Carolina court to sustain the contention of the appellee. In the case of Booker v. Wingo, 29 S. C. 122, 7 S. E. 52, the court of that state held:

"That contracts made solely on a compromise of indictments will, as a rule, be set aside."

There is nothing in the opinion of the court in that case which interferes in the slightest with the general rule which applies to cases of this kind. After deciding as it did, the court, among other things, said:

"But it is recognized that there are exceptions. It was held, in the case of Banks v. Searles, 2 McMul. 356, that a note given in part as compensation and partly to compromise a prosecution for assault and battery is not void, the consideration being adequate to sustain the action. In that case, Judge O'Neall said: 'There is in every assault and battery a public offense and a civil injury. The 'compensation' of the latter has always been recognized by the imposition of a much less punishment when it has been made.' There is also a civil injury in larceny, and we do not clearly see why the same principle should not apply to it, at least to the extent of 'compensation' for the property appropriated.

"Assuming, however, that the inducement was illegal, to the extent of the declaration of the defendant that he 'would use his influence to have the prosecution stopped,' does it necessarily follow that the whole transaction must be declared void ab initio? We do not think so. The plaintiff, under the advice of her friends, entered into the arrangement voluntarily. After the deed was executed and possession given, she acquiesced for over 18 months, and, in the meantime, the defendant had fully executed his part of the agreement. We concur with the referee and circuit judge that the plaintiff and defendant were in pari delicto, and that equity will not now, at her instance, declare the whole transaction void."

[3] Even if it had been shown that the parties to this transaction were actuated by the motives as contended by the appellee, there is no escaping the proposition that such action on their part was in the nature of compounding a felony, and each party, as we have said, would be guilty of fraud. The court below recognized this principle when it said:

"It may well be that the complainant, T. Gertrude All, does not appear in a very admirable position. She was, in the opinion of the court, beyond doubt stimulated in her action by her desire to protect her son from criminal prosecution and punishment. She acted upon the pressure of her maternal feelings for the safeguarding of her offspring."

The fact that she did not institute this suit until after the statute of limitations of the state of Georgia relating to the compounding of a felony expired tends strongly to show that she appreciated the enormity of the crime which, according to her own testimony, he had committed, and that she was careful to take no action as respects the cancellation of the deed until she had gotten her "head out of the halter."

It is a well-settled maxim that he who comes into equity must come with clean hands, and that the law will leave wrongdoers where it finds them. In Creath's Administrator v. Sims, 5 How. (U. S.) 192, 12 L. Ed. 111, the court said:

"The following principles of equity jurisprudence may be affirmed to be without exception, namely: That whosoever would seek admission into a court of equity must come with clean hands; that such a court will never interfere in opposition to conscience or good faith; that it will never be called into activity to remedy the consequences of laches or neglect, or the want of reasonable diligence."

In the case of Dent v. Ferguson, 132 U. S. 50, 10 Sup. Ct. 13, 33 L. Ed. 242, the court announced the following rule:

"Wherever two or more persons are engaged in a fraudulent transaction to injure another, neither law nor equity will interfere to relieve either of those persons, as against the other, from the consequences of their own misconduct. * * * The maxim, 'In pari delicto potior est conditio defendentis,' must prevail. It is against the policy of the law to enable either party, in controversies between themselves, to enforce an agreement in fraud of the law, or which was made to injure another."

[4] However, it is insisted by counsel for plaintiff that appellee's right of action is barred by the statute of South Carolina, and counsel for appellee replies to this proposition by saying that the cause of action did not accrue until the discovery of the fraud. We think that the contention of appellee as respects this point is untenable, inasmuch as the facts relied upon by appellee to cancel the deed, according to her own testimony, were known and fully understood by her at the time of the execution of the deed. This being so, we must inquire as to whether a sufficient length of time had elapsed to bar appellee's right to recover.

Counsel for appellants insists that this case comes within the purview of section 137, vol. 2, subdivision 6, of the Code of 1912, which is in the following language:

"Any action for relief on the ground of fraud, in cases which heretofore were solely cognizable by the Court of Chancery, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

This being a suit for cancellation of a deed, it comes clearly within the provision "solely cognizable by the Court of Chancery." Furthermore, it is "an action for relief on the ground of fraud" within the meaning of the term "in equity jurisprudence." In the case of Smith v. Linder, 77 S. C. 535, 58 S. E. 610, and Tucker v. Weathersbee, 98 S. C. 403, 82 S. E. 638, the Supreme Court of that state held that a suit in equity to set aside conveyances in fraud of creditors is barred within six years after creditors had knowledge of facts sufficient to put them on inquiry which, if followed up, would have disclosed the fraud. In the case of Dupont v. Du Bos, 52 S. C. 244, 29 S. E. 665, where it was sought to cancel a forged deed, the court said:

"At law fraud must be taken advantage of within six years of its discovery. Where, however, an equitable action must be brought, by analogy a court of equity will follow the period fixed in law cases by statute."

It is insisted by appellee that duress is not a species of fraud, and that therefore this statute does not apply. In 14 Cyc. § 1123, in referring to "duress" it is said to be "a species of fraud in which compulsion in some form takes the place of deception in accomplishing the injury." The doctrine is well stated in Pomeroy's Equity Jurisprudence, vol. IV, paragraphs 922 and 936, paragraph 922 being in the following language:

"Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those

which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. It covers different grades of wrong. It embraces contracts illegal, and therefore void at law as well as in equity; transactions voidable in equity because contrary to public policy; and transactions which merely raise a presumption of wrong, and throw upon the party benefited the burden of proving his innocence and the absence of fault."

And in paragraph 936 it is said:

"It is unnecessary to discuss the meaning of the phrase 'contra bonos mores,' since the doctrine is familiar. It is enough to say that all agreements in which the consideration past or future, or the executory terms stipulating for acts to be done or omitted, are contrary to good morals, are illegal and void in equity, and with a very few exceptions at the common law. This doctrine applies in equity, whatever be the external form of the contract, or its immediate purpose, or the particular nature of its illegality. Among the most important and familiar illustrations are the following: Contracts based upon the consideration, either past or future, of illicit sexual intercourse, or stipulating of such future intercourse, or in any manner promoting or furnishing opportunities for unlawful cohabitation or prostitution; contracts which constitute or amount to champerty or maintenance, these being highly criminal at the common law; contracts, executed or executory, given under the consideration of or stipulating for the compounding of a felony, the forbearance to prosecute for a crime, or the abandonment of a pending criminal prosecution."

The case of Brown v. Brown, 44 S. C. 378, 22 S. E. 412, is very much in point:

"With regard to the fourth exception, it may be better to state what the circuit judge did charge the jury on the subject of the statute of limitations. He charged: 'A man has six years from the discovery of fraud to attack that fraud—to attack the deed for fraud—six years from the time he discovers it; that is, six years from the time he knows, or has sufficient information to put him on inquiry as to the facts which constitute the fraud. Well, if Brown, the deceased, knew what he was doing when he made that deed, or had notice of all the circumstances of that deed, then the statute of limitations ran out at the end of six years, and he could not commence an action, nor those who come after him, because the heirs at law stood in his shoes.' The propositions of law embraced in this charge are fully sustained by the cases of Beck v. Searson, 8 Rich. Eq. 130, and Kirksey v. Keith, 11 Id. 33."

Also in the case of McMillan v. Cheeney, 30 Minn. 519, 16 N. W. 404, the Supreme Court of that state held that an action to set aside deeds of real estate obtained by threats, intimidation, and undue influence was "an action for relief on the ground of fraud, and subject to a limitation of six years."

[5] We are of the opinion that this statute applies to the instant case and that appellee's action is barred inasmuch as it appears that more than six years had elapsed before suit was instituted. Even if the statute in question did not apply to this case, we think appellee's cause of action is barred by laches. She had knowledge of the pendency of the suit to foreclose the mortgage. It further appears that she did nothing to assert any right which she may have had, nor did she notify the bank that she claimed the title to the land, thus permitting the bank to proceed to foreclose the mortgage and by her silence the bank expended large sums of money, to wit, $280.49 in that proceeding, in addition to employing attorneys to prosecute the same.

260 F.—25

If this statute were not in existence she would not only be estopped from ever thereafter asserting title to the premises in question, but she would be clearly barred by laches. There are many cases in equity where, under peculiar circumstances, one is barred from right of recovery by laches wherein not even the time required by the statute of limitations in actions at law had expired. When we consider the attitude of Mrs. All, to which we have referred, we think that this is peculiarly a case where the rule relating to laches should be applied. According to her own contention, if such be true, she is equally guilty with the bank of the offense of compounding a felony, and her subsequent conduct at every stage of the proceedings confirms this view. She comes into court with unclean hands and under the circumstances a court of equity will not permit her to take advantage of, her own wrong.

We have carefully considered the various cases relied upon to sustain the contention of the appellee, but we are clearly of the opinion that they do not apply to the case at bar, inasmuch as the facts upon which the decision in such cases is based are not analogous to the facts of this case. There are all told 17 assignments of error, but we do not deem it necessary to discuss the others in view of what we have already said.

For the reasons stated, the decree of the lower court is reversed. Reversed.